FILED
KENNETH J. MURPHY
CLERK

03 NOV 14  PM 3: 52

........ COURT
.......DIST OHIO
WEST DIV CINCINNATI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PATRICIA A. DAFFIN, | : | Case No. C-1-00-458 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | **MEMORANDUM OF PLAINTIFF** |
| FORD MOTOR COMPANY, INC., | : | **AS TO CLASS ISSUES PURSUANT** |
| | : | **TO ORDER OF THE COURT DATED** |
| Defendant. | : | **NOVEMBER 6, 2003 (DOC. #81)** |
| | : | |

Pursuant to the November 6, 2003 Order of the Court (Doc. #81), Plaintiff submits this supplemental memorandum directed to the class issues raised by the Court as set forth in its October 31, 2003 Order (Doc. #80). Below, each issue raised by the Court is addressed in the same sequential order.

However, before proceeding further, Plaintiff calls to the Court's attention that parallel litigation, involving the same plaintiff's counsel here, and involving the same throttle body assembly design and defect at issue here but installed in the Nissan Quest[1] was recently certified and preliminarily approved as a nationwide class action for settlement purposes. See Appendix, Tab A, *Goldenberg Decl.* at ¶ 9. As additional support for Plaintiff's pending motion here, the *Nissan* court's order preliminarily granting **national certification** is attached as Exh. 1 to *Goldenberg Decl.* (Appendix Tab A). Now, over 85,000 Nissan Quest owners throughout the country who have the same throttle body in the Ohio Ford Villagers, are obtaining relief from

---

[1] *Meyer v. Nissan North America, Inc.* No. BC263136, filed on December 6, 2001 in California Superior Court, County of Los Angeles. See Appendix Tab A, *Goldenberg Decl.* ¶ 5. This involves 1999 and 2000 model-year Nissan Quests which utilize the identical throttle-body assembly as 1999 and 2000 model-year Mercury Villagers. *Id.* at ¶ 6. The Court will recall that the 1999 and 2000 model-year Mercury Villagers and 1999 and 2000 model-year Nissan Quests were jointly manufactured by Ford and Nissan at the same production facility in Avon Lake, Ohio and have identical engine components, including the defective throttle body at issue. See Doc. #25 at 8, with attached Exh. C; and *Goldenberg Decl. at* ¶7-8.

Nissan.  Thus, the Court is urged to do the same here in Ohio with regard to the same model year

Ford Villagers.

**I.      Whether the unnamed putative class members have a cause of action if they have not yet experienced an injury as discussed in *In the Matter of Bridgestone/Firestone, Inc.*, 288 F.3d 10112 (7th Cir. 2002).**

Yes.  In this case, all class members have been injured by Ford's wrongful conduct, and

thus the concerns of the Seventh Circuit in *In the Matter of Bridgestone/Firestone, Inc.*, 288 F.3d

1012 (7th Cir. 2002), are not implicated.   The *Bridgestone/Firestone* court decertified a national

class action of an Indiana district court for two primary reasons: (i) improper application of

Indiana choice-of-law principles that uniformly applied Indiana law throughout all 50 states, as

opposed to analyzing variations in the law of those jurisdictions; and (ii) the Seventh Circuit

determined that given the magnitude of the case - involving over 60 million tires sold over a

period of ten years, with six tire models having 67 designs of different sizes and performance

criteria, against multiple defendants - the action was simply unmanageable.   *Id.* at 1015-16,

1019.

Central to the Seventh Circuit decertification was the variation in state tort law among the

50 states as to whether a cause of action arose in tort where a person was not physically injured

by the product.  *Id.* at 1017.  In denying Plaintiff's prior motion for national class certification,

this Court pointed out that this variation was fatal to national certification (See Doc. #61 at 4).

As a result, Plaintiff subsequently was granted leave by the Court to seek an Ohio only state class

certification, which, of course, is presently at issue.  In moving for an Ohio only class, Plaintiff

avoids the variation issue entirely, and now focuses strictly on Ohio law.  As shown below,

under the facts and allegations developed here, Ohio law allows Plaintiff to fully proceed and

this case is ripe for certification as to all claims.

{00008999; 1}

First, the record is clear that every Ford Villager at issue has in fact manifested the complained of throttle body assembly defect. Thus every defect is manifested and exists in every vehicle – this is not a case where a *theoretical* defect *may* occur. The defect has and will continue to occur to every vehicle, and Ford refuses to fix it. The defective design causes a build up of carbonized, sticky, sludge that ultimately locks the accelerator (gas pedal), thereby making the vehicle unsafe and faulty as to the ability to reliably operate the vehicle. As to the record, the Court is referred to Plaintiff's prior and current motions to certify (Doc. # 25 at 6-23 and Doc. # 66 at 1-2). In fact, after the briefing of the motion was completed in January 2003, the facts are supplemented here – making it ever more obvious that the defect is universally manifested. Plaintiff's Villager has just had a *fifth* throttle assembly installed on October 22, 2003 due to the locking accelerator. See *Affidavit of Patricia Daffin* (Appendix Tab B). The sheer odds of the repetitive failure of five sequentially installed throttle bodies is proof by itself that the defect is manifest.

Even more significant are the documents produced by Nissan (filed under seal, at Appendix Tab A, Exh. 2) regarding the Nissan Quest in *Meyer v. Nissan North America, Inc., supra.* These documents confirm that the experience of Ms. Daffin (on her fifth throttle body assembly) is virtually same for every 1999 and 2000 model-year Mercury Villager in Ohio.[2] See *Goldenberg Decl.,* Appendix Tab A at ¶ 10. The Nissan documents were generated through Nissan's employee vehicle leasing program (the Jumpstart Program). *Id.* at ¶ 11. The Jumpstart Program, operated by Nissan's Smyrna, Tennessee manufacturing facility, had 221 1999 model-

---

[2] Because a nationwide class action settlement has been reached in the *Meyer* litigation and that settlement is scheduled for final court approval on January 13, 2004, thereby essentially terminating that litigation, these Nissan documents are being filed under seal pursuant to this Court's March 22, 2001 Stipulated Protective Order for Discovery Produced by Nissan North America, Inc. That Order requires these documents to be filed under seal.

year Nissan Quests and the vehicles were in the leasing program for two years. *Id.* at ¶12-13.[3]
All maintenance and repairs for these vehicles were closely monitored, measured and recorded
by Nissan specifically to track the quality of these vehicles. Out of the 221 vehicles, 155 repair
records were generated as a result of locking or sticking throttle-body assemblies in these
vehicles in just this two year period. *Id.* at ¶14-15. During this brief period, the occurrence rate
of defect in the throttle bodies - sticking or locking accelerator pedals – exceeded 700 per 1000.
When applying this rate over a four year period, it will very likely exceed 1000 incidents per
1000 vehicles. *Id.* at ¶17-18. Thus, it is reasonable to infer that the defect has virtually
manifested itself in every Villager in Ohio (Model Year 1999 and 2000). *Id.* at ¶ 19. And
because the defect manifests across-the-board, there can be no issue that class members lack a
factual basis to seek redress. Consequently, the "incident/non-incident" mantra of Ford, as well
any concerns of the Seventh Circuit in *Bridgestone/Firestone*, are irrelevant to the facts here.

Although the record is clear that the defect is universal, and no distinction should be
made between incident versus non-incident, even if the Court did so, the Ohio claims here are
viable regardless. In this light, each claim is examined below.

A.    The Ohio Consumer Sales Practices Act, R.C. §1345.01, *et seq.*

The Ohio Consumer Sales Practices Act (CSPA) Rev. Code §1345.01, *et seq.* was
enacted to "prevent unfair, deceptive, and unconscionable acts and practices, to provide strong
and effective remedies, both public and private . . . and to eliminate any monetary incentives for
suppliers to engage in such acts and practices." *Celebrezze v. Hughes Motors,* 18 Ohio St.3d 71,
74 (1985). Since the CSPA focuses on deceptive and unconscionable conduct, it is conduct itself
that gives rise to the injury and cause of action. Thus, unlike a tort involving physical injury as

---

[3] Earlier and subsequent model-year Quests also participated in the Jumpstart Program. *Goldenberg
Declaration,* Appendix Tab A at ¶12.

in *Bridgestone/Firestone*, a CSPA injury occurs, and the causes of action arises, at the time the seller engages in the prohibitive deceptive conduct. In *Pomianowski v. Merle Norman Cosmetics, Inc.*, 507 F.Supp. 435, 437 (S.D. Ohio, 1980), Judge Rice pointed out that the essence of a CSPA cause of action brought under R.C. §1345.09 is the unfair, deceptive, or unconscionable conduct undertaken in connection with the consumer transaction.

Very recently, in *Delahunt v. Cytodyne Technologies*, 241 F.Supp.2d 827 (S.D. Ohio, 2003), the district court specifically ruled in the context of a class action that the Seventh Circuit's *Bridgestone/Firestone* tort-based physical injury issue is entirely <u>irrelevant</u> to the Ohio CSPA. *Delahunt* involved complaints of physical injury due to the ingestion of a dietary supplement, Xenadrine RFA-1. With regard to the Ohio CSPA, the court held that the injury occurred by virtue of the unfair or deceptive conduct. *Id.* at 835-36.

Therefore, because Ms. Daffin intends to pursue her CSPA claim by addressing Ford's uniform failure to abide by its express Bumper-to-Bumper warranty to correct the defect, as well as engaging in evasive conduct towards the class intentionally crafted to dodge its express warranty obligations, the class claims arose, and the injury occurred, as a result of this conduct. *See* Mot. for Cert. (Doc. #66) at 14.

B.    Breach of Express Warranty, Rev. Code §1302.26(A)(1)

Just like the Ohio CSPA, Plaintiff Daffin's contract-based express warranty claim R.C. §1302.26(A)(1), set forth in Ohio's version of UCC Article 2, bears no relationship to a tort claim involving physical injury in *Bridgestone/Firestone*. Here, the cause of action and injury to the class arose when Ford breached its express uniform written promise to the class in its Bumper-to-Bumper warranty, by failing to "repair, replace, or adjust all parts on [the] vehicle

(except tires) that are defective in factory-supplied materials or workmanship."[4]  Ford does not deny making this express and uniform written promise in the Bumper-to-Bumper warranty at the time each of the Villagers were sold.  The Ohio Supreme Court recognizes that a UCC express warranty claim arises when a car manufacturer like Ford fails to effectively repair and replace the defect, subsequently leaving the purchaser with a defective product not conforming to the warranty, resulting in the warranty failing its essential purpose.  *See Goddard v. General Motors Corp.*, 60 Ohio St. 2d 41, 396 N.E.2d 761, 764-65 (1979).  Thus, since Ford never fixed the defective throttle body assembly as promised under the expressed warranty, it has breached the warranty and the relief requested is appropriate.

C.    Breach of Implied Warranty

Like the other claims, in Ohio the claim for breach of implied warranty in tort is fully cognizable under Ohio law and does not implicate any of the concerns raised in *Bridgestone/Firestone*.  In *LaPuma v. Collinwood Concrete*, 75 Ohio St.3d 64, 661 N.E.2d 714 (1996), the Ohio Supreme Court instructed that a common law tort claim for breach of implied warranty arises even where the injury is economic damages based on just the defective condition of the product itself.  There, the plaintiff had colored concrete poured for a driveway at his residence.  However, after the concrete was poured, it was discolored, and plaintiff brought an action in tort for breach of an implied warranty of workmanlike quality after defendant failed to remedy the defect.  *Id.* at 64, 61 N.E.2d at 714.  Plaintiffs claimed that they suffered solely "economic loss," which the Supreme Court defined as arising from "damage to the driveway itself," and *not* any form of harm or injury to plaintiff's person.  *Id.* at 66-67, 61 N.E.2d at 716.

---

[4] This, of course, constitutes an express warranty under Rev. Code §1302.26(A)(1), as it is a "affirmative of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the base of the bargain [that] creates an express warranty that the goods shall conform to the affirmation or promise."  *Id.*

The Supreme Court held that under these circumstances an implied warranty claim in tort could be maintained under Ohio common law. *Id.*

Likewise, Ms. Daffin may maintain an implied warranty claim in tort based solely on economic loss due to the defective condition of the Villager.

D.    Common Law Negligent Design and Manufacture

In the recent Ohio Supreme Court decision in *City of Cincinnati v. Beretta USA Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002), a claim for economic loss by the City of Cincinnati was sustained under the common law tort of negligent design of handguns. As in *LaPuma, supra,* the court instructed that a "failure to allege other than economic damages does not necessarily destroy the right to pursue common-law product liability claims." *Id.* at 424, 768 N.E.2d at 1146. The court then found that the City could recover economic losses under a claim of negligent handgun design for failure to include feasible safety features. *Id.* at 425, 768 N.E.2d at 1147. Thus, Ohio common product liability tort law claims authorize a recovery for all forms of economic loss, including economic loss to the product itself due to its defective condition as brought by Ms. Daffin.

II.    **How the individualized issues of reliance of the putative class members impact the commonality of warranty claims.**

Individual issues of reliance do not exist in this case. In Ohio, there simply are no individualized issues of reliance under either an express warranty claim based on R.C. §1302.26(A)(1), or for breach of implied warranty. With regard to the express warranty claim under R.C §1302.26(A)(1), the Court must bear in mind that the existence of the warranty is not disputed – Ford's Bumper to Bumper warranty is uniform, in writing, and promised to "repair, replace or adjust all parts on [the] vehicle (except tires) that are defective in factory-supplied materials or workmanship." *See* Doc. #44 at Exh. B, p. 1. The warranty was made to each and

every purchaser of the Ford Villager. Thus, as opposed to other express warranty disputes, there is no issue over whether an express warranty exists.

Accordingly, issues of individual reliance are not invoked under Ohio express warranty law. In *Norcold, Inc. v. Gateway Supply Co.*, 2003 Ohio 4252, 2003 Ohio App. LEXIS 3772 (Shelby Cty., Aug. 11, 2003)(attached at Appendix Tab C), the Ohio Third Appellate District, in a dispute based on a written express warranty, held that reliance was not a required element of a written warranty under R.C. §1302.26 where there was no dispute that the warranty was made by the seller. *Id.* at *P16. The court explained that:

> Express warranties are as much a part of the contract as any other term, ***and the right to damages on the breach depends on nothing more than the breach of warranty.*** In other words, [a] warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Id.* (emphasis added.) The *Norcold* court was careful to note that reliance can be at issue where the parties dispute the existence of the warranty itself. But when there is an express written warranty, which is the case here with Ford's Bumper to Bumper warranty, "reliance is not an element in a claim for breach of an express written warranty." *Id.* at *P15. Thus, under Ohio law, individual reliance is not an issue here.

This conclusion is further buttressed by well-established Ohio Supreme Court precedent, as well the reasoning of fellow federal courts. In particular, the Ohio Supreme Court in *Baughman v. State Farm Mut. Auto. Ins. Co.*, 88 Ohio St. 3d 480, 727 N.E.2d 1265 (2000) reiterated that under Civ. Rule 23 individualized proof of reliance is not an issue where standardized form documents form the basis of the claim. *Id.* at 490, 727 N.E.2d at 1274-75.

This is because "proof of reliance . . . may be sufficiently established by inference or presumption." *Id.* (citations omitted)  Also, in *Szabo v. Bridgeport Machines, Inc.*, 199 F.R.D. 280 (N.D. Ind. 2001) vacated and remanded on other grounds 249 F.3d 672 (7th Cir. 2001), the district court found that when the wrong perpetrated on the class was done in a uniform manner "such as when all plaintiffs receive virtually identical written materials from defendants, courts typically hold that individual reliance issues do not predominate." (citations omitted)  This is because it is "logical" to presume reliance where the complained of representation is propagated through "uniform written representations made in connection with the sale." *Id.* at 287.  The same would hold true here for the class members even if reliance was an issue, which, in any event, it is not pursuant to *Norcold, supra.*

Next, as to the implied warranty claim in tort under Ohio law, the elements of this claim do not include reliance, and therefore there is no issue of individualized reliance.  The elements of breach of implied warranty in tort are as follows:   (i) a defect exists in the product manufactured and sold by the defendant, (ii) the defect existed at the time the product left the defendant, and (iii) the defect is a direct and proximate cause of loss.[5]

**III.    Whether Plaintiff's tailoring of her claims has a preclusive effect on putative class members later asserting claims for personal injury or putative class members with both personal injury and property damage claims.**

Sixth Circuit case law establishes that there will be *no* preclusive effect on any putative class members in this action who may later assert claims for personal injury or other property damage claims.  This is because personal injury claims have been expressly excluded from the class definition (see Mot. for Cert, Doc. #66, at 2), and because only issues and claims with the same identity of supporting facts and evidence can be precluded later.  In *Bittinger v. Tecumseh*

---

[5]    *McDonald v. Ford Motor Co.*, 42 Ohio St. 2d 8, 10, 326 N.E.2d 252, 253 (1975); *see also LaPuma v. Collinwood Concrete*, 75 Ohio St. 3d 64, 661 N.E.2d 714 (1996) (in the context of a consumer action to recover, among other things, economic damages for breach of implied warranty in tort absent privity.).

*Products Co.,* 123 F. 3d 877 (6th Cir. 1997), the Sixth Circuit instructed that "a claim will be barred by prior litigation if the following elements are present":

> (1) a final decision on the merits by a court of competent jurisdiction; (2) *a subsequent action between the same parties or their "privies"*; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Id.* at 880.   First, as to "privies" in the context of a class action, the Sixth Circuit instructs that under RESTATEMENT (SECOND) OF JUDGMENTS §41-(1)(1980), an appointed class representative constitutes a privy for class members.   *Id.*   As to *Bittinger's* third and fourth elements (which are relevant to the Court's inquiry here), it is clear that any issues in this case do not share any identity with any potential future claims of putative class members whose claims are for physical injury or other property damage.   This is because the issues raised and claims now before the Court are connected only to the facts alleged and the evidence to be adduced with regard to injunctive relief and incidental monetary damages in this action.

Here, the Sixth Circuit has held that in order to bar subsequent litigation, "there must be an identity of the causes of action that is, ***an identity of the facts creating the right of action and of the evidence necessary to sustain each action***."  *Westwood Chemical Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981)(citations omitted)(emphasis added); *see also, State Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 269 n.9 (6th Cir. 1979) ("[i]n order for res judicata to apply, the facts or evidence essential to maintain the subsequent cause of action must be identical to the prior suit") (citations omitted).   Importantly, in *Westwood Chemical,* the Sixth Circuit relies upon *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133-34 (2nd Cir. 1975), which states:

> The test for determining whether causes of action are the same for purposes of res judicata has been variously expressed.   Most frequently cited * * * are whether a different judgment in the second action would impair or destroy rights or interests

established by the judgment entered in the first action, whether the same evidence is necessary to maintain the second cause of action as was required in the first, and whether the essential facts and issues in the second were present in the first.

Thus, under this analysis, there would be a divergence in the facts, issues and evidence employed in this litigation when compared to the unique facts, issues, and evidence needed to prove elements of either a personal injury or other property damage claims. Since those claims will not be presented or litigated here, and since they are different in kind and unique, no preclusion effect will apply to any later litigation.

**IV.    Whether injunctive relief, and thus class certification under Federal Rule of Civil Procedure 23(b)(2), is appropriate if remedies are available at law.**

Yes. As previously briefed by Plaintiff in her moving papers for certification (Doc. #66 at pp. 9-10) as well as in her reply memorandum in support of certification (Doc. #75 at pp. 18-23) injunctive relief is wholly appropriate here. First, the Ohio CSPA statutorily authorizes this Court to employ any form of relief, without any preference of one form over the other, including rescission, damages, "or other appropriate relief in a class action under Civil Rule 23." R.C. §1345.09(D). By design, the Ohio CSPA was intentionally drafted so there would not be any pre-conceived preference for remedies, and hence, the employment of equitable or injunctive relief should be considered no differently than damages. The inquiry should focus on the most effective and complete relief to redress the CSPA violation. Plaintiff has therefore requested specific injunctive relief because it is the most complete and comprehensive remedy for the class.

Ohio Courts unanimously agree that the CSPA is designed specifically to give courts maximum power and flexibility to craft the best relief possible without preference of any form over the other. As one court has explained:

The Ohio Supreme Court has held that consumer protection laws *must be interpreted in a manner that is calculated to provide courts with flexibility in fashioning remedies* intended by the General Assembly to redress the wrong committed and reimburse the loss occasioned. In light of the Supreme Court's explicit policy statement, *it is evident that R.C. § 1345.09(B) vests courts with broad discretion when calculating the relief to be accorded to members of a consumer class action*.

*Zeff v. Rose Chevrolet, Inc.*, 1993 Ohio App. Lexis 3281, *3-4 (Butler Cty., June 28, 1993)(emphasis added)(attached at Appendix Tab D). The CSPA "provides consumers with additional remedies for the same conduct *that might not be available under other statutes or common law*." *Estate of Cattano v. High Touch Homes, Inc.*, 2002 Ohio App. Lexis 2754, *18 (Ohio Ct. App. May 24, 2002) *jurisd. denied* 96 Ohio St.3d 1513, 775 N.E. 2d 856 (2002)(emphasis added)(attached at Appendix Tab E).

Next, similar to the CSPA, the Court has maximum flexibility and discretion for fashioning relief for breach of express warranty. In fact, R.C. §1302.90 expressly invites the court to utilize equitable relief in the form of specific performance (as opposed damages or other legal relief) in the case of a breach of express warranty, and encourages the Court to exercise the broadest possible flexibility in granting relief under "such terms and conditions as . . . the court may deem just." R.C. §1302.90(A) and (B). Indeed, UCC Comment 1 to § 2-716 (the UCC model provision to the Ohio Revised Code counterpart) illuminates the drafters' intent "to further a more liberal attitude . . . in connection with *specific performance* of contracts of sale." *See also, Motor Vehicle Mfrs. Ass'n. v. New York*, 146 A.D.2d 212, 216-17 (N.Y. Ct. App. 1989) (pointing out that under UCC § 2-716 that relief in the form of specific performance was already permitted, and ordering the replacement of a defective car with a new one); *Eastern Airlines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 442 (S.D. Fla. 1975) ("[u]nder the U.C.C. a more liberal test in determining entitlement to specific performance has been established than the test one must

meet for classic equitable relief"); *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 932 (N.D. Cal. 1970). Furthermore, RESTATEMENT (SECOND) OF CONTRACTS § 359 cmt. a (1981) also concludes that "the modern approach is to compare remedies [legal and equitable] *to determine which is more effective in serving the ends of justice.* Such a comparison will often lead to the granting of equitable relief. Doubt should be resolved in favor of the granting of specific performance or injunction." (Emphasis added). Specific performance here would satisfy the drafters' desire that remedies "be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."[6] In contrast, a remedy at law will fall short of being "as complete as practical and as efficient to the ends of justice." *See Walla Walla City v. Walla Walla Water Co.* 172 U.S. 1, 12 (1898); *see also National Marking Mach. Co. v. Triumph Mfg. Co.*, 13 F.2d 6, 9 (8th Cir. 1926) ("[t]he adequate remedy at law, which will preclude the grant of specific performance of a contract by a court of equity, *must be* as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance").

Lastly, although the foregoing bases to employ injunctive relief is more than sufficient, a third source of a court's power to award injunctive or equitable relief inheres in its power sitting as a federal court. In general, "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction" and must presume the full scope of their equitable authority. *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). State law does not limit these federally-derived equitable powers. Thus, when the equitable jurisdiction of the Court is invoked, the Court employs its federally-established equitable powers in fashioning appropriate relief, even where state-created rights are

---

[6] UCC § 1-106(1).

enforced within the context of diversity jurisdiction. *See, e.g., Guaranty Trust Co. v. York*, 326 U.S. 99, 104-07 (1945).

The Court need not shy from employing the full and complete injunctive relief requested by Plaintiff. As the authorities just reviewed provide, the Court is encouraged and empowered to make fashioning comprehensive and complete relief its guiding polestar. Artificial and arcane notions that legal remedies might be preferred over injunctive relief are simply irrelevant.

**V.    Whether a class certification under 23(b)(2) is proper while compensatory damages are at issue, eliminating the opt-out and notice due process requirements of 23(b)(3).**

Because the claims before the Court permit wide latitude for fashioning the best relief possible, class certification of this action under Rule 23(b)(2) is in the best interests of the class. Indeed, equitable relief here will provide the most effective and comprehensive relief to the class. Thus, remaining consequential damages of the class are collateral in comparison.

The flexibility under Rule 23(b)(2) has been fully appreciated by fellow jurists in the Southern District of Ohio. For example, in *Day v. NLO*, 851 F.Supp. 869, 886 (S.D. Ohio 1994) Judge Spiegel, in certifying a Rule 23(b)(2) medical monitoring class, aptly noted that utilizing injunctive powers to oversee the medical monitoring was "vastly superior to a lump sum monetary payment [legal relief]".

The Court has solid footing in certifying under Rule 23(b)(2) because after granting the injunctive relief, only incidental monetary damages would remain, awarding modest out-of-pocket damages on a claims-made basis to class members. Damages would be in the nature of reimbursement for past throttle body repairs not covered by Ford or vehicle rental expenses due to a repair. *See* Mot. for Cert. (Doc. # 66) at 18. Certainly, in order for the claims made process to be viable, it would be appropriate to issue notice in this regard, which the Court has discretion to do under Rule 23(d).

Nonetheless, the predominant, and vastly superior, form of relief would either be a vehicle lifetime warranty on the defective throttle body assembly to replace the defective part on a regular basis before the accumulating sludge reaches the point of locking the accelerator; or in the alternative, a requirement that Ford pay a lump sum for the future cost of paying for the regular replacement of the throttle body assembly themselves.[7]  *See* Mot. for Cert. (Doc. #66) at 9.  The Sixth Circuit confirms that where "the primary relief sought is injunctive or declaratory, and the monetary relief requested can be characterized as incidental or equitable, Rule 23(b)(2) can be applied."[8]  Recently in *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 446-47 (6th Cir. 2002) the court pointed out that the advisory committee's note to Rule 23(b)(2) expressly envisioned monetary relief so long as such relief is not predominant.  *Id.*  *Coleman* also noted that eight fellow federal Circuit courts - the vast majority - construe Rule 23(b)(2) to also allow for monetary damages to be recovered under Rule 23(b)(2) so long as the relief does not predominate over the injunctive relief.  *Id.*  And although *Coleman* did not definitively settle the issue, it did give guidance as to when injunctive relief is predominant.  Specifically, the focus is on whether the interests of the class are homogeneous, which is indicative of predominant injunctive relief, as opposed to converging or competing interests among class members, which may necessitate certification under Rule 23(b)(3) instead.  *Id.* at 448.

With regard to the relief sought here, Plaintiff's request for relief is entirely homogeneous and thus the injunctive relief is proper under Rule 23(b)(2).  There is no possibility for any conflict whatsoever because relief in the form of a vehicle lifetime warranty applies equally to all, and there would be no conflict or competition between class members because the relief is

---

[7] Certainly, Ford always has the option of redesigning the throttle body assembly to avoid the condition that creates the locking accelerator and subsequently install the newly designed throttle body assembly in the class members' Villagers.  This would naturally relieve Ford of the lifetime warranty relief requested above.

[8]    *Mitchell v. Dutton*, 865 F.2d 1268, 1989 U.S. App. Lexis 34, *11 (6th Cir. 1989), cert. denied 490 U.S. 1048 (1989)(attached at Appendix Tab F).

not rationed or apportioned creating divergent interests. In sum, relief to each is equal and unaffected by relief to a fellow class member. Second, this relief dwarfs the remaining incidental monetary damages.

Moreover, ease of calculation and simplicity of the nature of these damages – such as repair costs or rental reimbursements - are matters of straightforward calculation and proof and take the form of receipts evidencing the expense. Therefore, the efficiencies created through adjudicating this case on a class-wide basis remain intact and in no way implicate the concerns of the Sixth Circuit that "complicated factual determinations" would overly burden certification under Rule 23(b)(2). *Id.* at 449-50.

Moreover, Newberg on Class Actions and Wright & Miller support this approach. In fact, Newberg urges that it is a useless exercise for courts to become entangled in disputes over which form of relief is predominant under Rule 23(b)(2):

> [I]t is counterproductive for the court to spend time to try to resolve this largely discretionary question which does not address the merits of the case. Rather the court should conclude that when the Rule 23(a) prerequisites are satisfied declaratory or injunctive relief is sought as an integral part if the relief for the class, then Rule 23(b)(2) is applicable regardless of the presence or dominance of additional prayers for damages relief for class members.

A. Conte & H. Newberg on Class Actions §4:14 p. 93-94 (4th ed. 2002). Wright & Miller states that "if Rule 23(b)(2) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2). Those aspects of the case not falling within Rule 23(b)(2) should be treated as incidental." 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure, §1775 (2d ed. 1986).

Finally, although Plaintiff does not believe it is warranted here due to the simplicity of the incidental damages at issue in this case, it has also been advocated that a court has discretion not only to require notice under Rule 23(b)(2), but also to allow class members in a 23(b)(2)

class to opt out of the monetary phase of the proceedings. *See,* Newberg, *supra,* at §4:14 pp. 104-105. In *Eubanks v. Billington,* 110 F.3d 87, 96 (D.C. Cir. 1997), in the context of a Rule 23(b)(2) class, the appellate court noted that there was discretion to permit opt outs for monetary claims by certifying these claims under Rule 23(b)(3), while the injunctive claims remained governed by Rule 23(b)(2) – thereby allowing for a so-called "hybrid" class. While Plaintiff does not believe such an approach is warranted here, given the Court's invocation of this issue, it is important that the Court is aware of these alternatives.

VI.    **Whether class action treatment is the superior method for resolving this dispute given the availability of filing a complaint with the National Highway Safety Traffic Administration and its authority to remedy safety-related defects.**

Yes. At the outset, the Court should remain mindful of several threshold matters. First, consideration of the superiority requirement is *only* relevant to certification under Rule 23(b)(3), not to Rule 23(b)(2) class, under which Plaintiff urges certification. Second, the express language of Rule 23(b)(3) "that a class action is superior to other available methods for the fair and efficient *adjudication* of the controversy" (emphasis added), makes it clear that the superiority analysis should conducted with regard to other forms of adjudication in the judicial system – not with regard to any administrative action of a regulatory agency such as the National Highway Traffic Safety Administration (NHTSA), or other perceived forms of administrative relief. *See also* Committee Note of 1966 to Revision of Rule 23. "Adjudication" is defined as "[t]he legal process of resolving a dispute; the process of *judicially deciding* a case." Black's Law Dictionary 42 (7th ed. 1999)(emphasis added).

This result is confirmed by common sense and a basic understanding of Rule 23. A primary purpose of Rule 23 is to ensure that aspiring individual plaintiffs are of sufficient pedigree to represent and act for others - the class. In this vein, had Ms. Daffin just brought an

individual action with identical claims, it would never be conceived that she should file a complaint with NHTSA in order to seek relief for her individual claims. And it therefore follows then that if Ms. Daffin meets the requirements of Rule 23 such that she can represent a class, it would be illogical to inject a NHTSA complaint filing requirement under the guise of superiority since to do so is not an alternative method of adjudication for either her individually or for other members of the class.

At any rate, the facts already before this Court are that NHTSA has indeed received complaints, including complaints involving injuries, from both Ford Villager and Nissan Quest owners notifying it of the throttle body problem - and has done nothing. Thus, the Court need not consider this issue any further. See prior Mot. for National Class Cert. (Doc. # 25) at 12 and n. 68 therein; and Goldenberg Decl. thereto at Exh. E, attaching 7 complaint summaries by owners to NHTSA. Sadly, NHTSA's inattention to the problem is not surprising. The agency has been the subject of widespread Congressional and public criticism for its lack of competence to perform rudimentary regulatory tasks. *See* prior Reply Mem. in Support of National Class Cert (Doc # 44) at 58; and Murdock Decl. thereto at Exh. H. In fact, a past NHTSA administrator concluded that "NHTSA lacks a proactive program to uncover defects." *Id.* Moreover, the current NHTSA regime has been widely criticized for evolving from an automobile industry watchdog to ensure safety on roadways to being an industry "partner." *Id.*

Finally, if a court desired to require a plaintiff seeking a class action to file a complaint with NHTSA, it would impose a requirement that the National Traffic and Motor Vehicle Act of 1966 (the Safety Act) does not even contemplate. And doing so would in effect create an illicit back-door rule of NHTSA preemption, denying a plaintiff of the right to seek redress in a court of law while her legal claims as well as the claims of the class languish and become stale, with a

running statute of limitations to boot.  Indeed, the Safety Act itself rejects any such consideration through its savings clauses, 49 U.S.C. §30103(d) & (e), where the Act expressly preserves state law warranty rights as well as state-derived legal claims, even in cases where a manufacturer is in compliance with a promulgated NHTSA motor vehicle safety standard.  *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 868 (2000); *Myrick v. Freuhauf Corp.*, 13 F.3d 1516 (11th Cir. 1994), aff'd sub. nom., 514 U.S. 280 (1995); *H.P. Hood & Sons, Inc. v. Ford Motor Co.*, 345 N.E.2d 683 (Mass. 1976).

Even Ford must begrudgingly concede that because *no* NHTSA motor vehicle safety standard exists that governs the throttle body assemblies, there is no basis for Ford to raise any issue of express or implied preemption.  See *Freightliner Corp. v. Myrick*, 514 U.S. 280, 185 (1995) (invoking the savings clause of the Safety Act [49 U.S.C. §30103(d) and (e)] and rejecting the argument of preemption because NHTSA suspended requirements mandating the use of ABS devices); *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2000) (instructing that any implied preemption question analysis must first be premised upon a "particular Safety Act *standard*").

## VII.    Conclusion

Having answered the Court's inquires as to class issues, and there being no obstacles that should prevent class certification, Plaintiff respectfully urges the Court to certify the class pursuant to Rule 23(b)(2) class as requested.

Respectfully submitted,


John C. Murdock (0063749)
Jeffrey S. Goldenberg (0063771)
Theresa L. Groh (0029806)
Murdock Goldenberg Schneider & Groh, LPA
700 Walnut Street, Suite 400
Cincinnati, Ohio  45202-2011
(513) 345-8291 Telephone
(513) 345-8294 Facsimile
**Counsel for Plaintiff**

Sean R. Matt, Esq.
Steve W. Berman, Esq.
Hagens Berman
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
(206) 224-9327 Telephone
(206) 623-0594
**Co-Counsel Admitted Pro Hac Vice for Plaintiff**


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served via electronic service and U.S. Mail service upon:  Gary M. Glass, Esq., Thompson Hine, LLP, 312 Walnut Street, Suite 1400, Cincinnati, Ohio 45202 and John F. Niblock, Esq., O'Melveny & Myers LLP, 555 13th Street, N.W., Suite 500, Washington, D.C. 20004-1109, this 14th day of November, 2003.