PLAINTIFF'S
EXHIBIT

A
tabbies

1 of 1 DOCUMENT

## NORCOLD, INC., PLAINTIFF-APPELLANT v. GATEWAY SUPPLY COMPANY AND DAYCO PRODUCTS, INC., DEFENDANTS-APPELLEES

### CASE NUMBER 17-03-02

### COURT OF APPEALS OF OHIO, THIRD APPELLATE DISTRICT, SHELBY COUNTY

*2003 Ohio 4252; 2003 Ohio App. LEXIS 3772; CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88*

### August 11, 2003, Date of Judgment Entry

**PRIOR HISTORY:** [**1] CHARACTER OF PROCEEDINGS: Civil Appeal from Common Pleas Court.

**DISPOSITION:** Judgment affirmed in part and reversed in part; cause remanded.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** CHARLES H. BROWN, III, Attorney at Law, Cincinnati, OH, For Appellant.

JAMES E. WYNEE, Attorney at Law, Detroit, MI, For Appellant.

STEPHEN V. FREEZE, Attorney at Law, Dayton, OH, For Appellee, Gateway Supply Company.

TERENCE L. FAGUE, Attorney at Law, David P. Pierce Attorney at Law, Dayton, OH, For Appellee, Dayco Products, Inc.

**JUDGES:** Walters, J. SHAW and CUPP, JJ., concur. r.

**OPINIONBY:** Walters

**OPINION:**

**Walters, J.**

[*P1] Plaintiff-Appellant, Norcold, Inc. ("Norcold"), appeals separate Shelby County Common Pleas Court decisions granting summary judgment in favor of Defendants-Appellants, Gateway Supply Company, Inc.

("Gateway") and Dayco Products, Inc. ("Dayco"). Because claims for breach of an express written warranty do not mandate reliance on the part of the buyer, we must reverse the trial court's dismissal of Norcold's express warranty claims against Gateway. With regard to Norcold's claims for breach of the implied warranties of merchantability and fitness for a particular purpose, no warranty of merchantability exists [**2] because the part in question was a newly constructed component and no average or usual standards for determining ordinary performance or quality could be determined; however, questions of material fact do remain as to whether Norcold relied on Gateway to supply parts fit for Norcold's particular purpose. Additionally, because a commercial purchaser of a defective product cannot maintain a claim for purely economic loss under common law tort theories of recovery and because Norcold failed to plead a contract cause of action, its claims against Dayco are barred as a matter of law.

[*P2] Norcold engages in the production and sale of refrigerators to manufacturers of recreational vehicles and camping trailers. For several years, Gateway has acted as a distributor of pipes, fittings, and valves to Norcold for use in refrigerator assembly. In 1992, Norcold representatives approached Gateway to discuss combining two pre-existing parts used to power Norcold's refrigerators. This combined unit would become known as a "tap tee," which is used to carry flammable gas. Thereafter, Gateway consulted with Dayco to manufacture the part.

[*P3] Subsequently, Dayco delivered the parts to [**3] Gateway, who then distributed them to Norcold, pursuant to Norcold's purchase orders. The purchase

Case 1:00-cv-00458-SJD   Document 88-2   Filed 11/21/2003   Page 2 of 34

Page 2
2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

orders afforded Norcold the ability to test each tap tee prior to final assembly, and each part was tested twice before being integrated into the refrigerators. In summer 1999, Norcold found that the tap tees were subject to stress corrosion cracking and, thus, potentially hazardous. Accordingly, Norcold issued a recall campaign of its mobile refrigerator units and allegedly suffered damages in excess of $ 25,000.

[*P4]   As a result, Norcold initiated suit against Gateway, alleging breach of contract and breach of express and implied warranties. Gateway then filed a third-party complaint against Dayco, claiming it was entitled to indemnification and damages for breach of contract and express and implied warranties. Thereafter, Norcold amended its complaint to include Dayco as a defendant, asserting breach of express and implied warranties. In response to the amended complaint, Gateway counter-claimed against Norcold for breach of contract, payment of an existing account, and unjust enrichment. Gateway also filed a cross-claim against Dayco, alleging breach of contract and unjust [**4] enrichment. Dayco responded to the amended complaint and cross-claim, maintaining that it was entitled to indemnification or contribution in the event it was liable to either Norcold or Gateway.

[*P5]   After completing extensive discovery, Gateway moved for summary judgment against Norcold and Dayco, and Dayco moved for summary judgment against Norcold and Gateway. In a May 20, 2002 judgment entry, the trial court granted Gateway's motion for summary judgment in full, thus dismissing all claims of both Norcold and Dayco. In a separate judgment entry filed the same day, the trial court denied Dayco's motion for summary judgment against Norcold.

[*P6]   Prior to the court's decisions on the summary judgment motions, Norcold moved for leave to file a second amended complaint, stating that it wanted to separate the claims against Gateway, "which are contractual in nature, from those against Dayco[,] * * * which are based in tort." The motion was initially denied; however, upon Norcold's motion to reconsider and after the claims against Gateway were dismissed, the trial court granted Norcold leave to amend its complaint for a second time. Therein, Norcold re-alleged claims against [**5] both Gateway and Dayco. Gateway and Dayco both responded with the same claims as argued in response to Norcold's first amended complaint.

[*P7]   On September 4, 2002, pursuant to an agreed judgment entry, all claims asserted by Norcold against Gateway in the second amended complaint were dismissed in accordance with the trial court's prior grant of summary judgment. Thereafter, Dayco again moved for summary judgment against Norcold. The trial court granted the motion on December 13, 2002, finding that absent privity of contract, Ohio law does not provide a common law remedy in tort to a commercial purchaser of a defective product for purely economic loss. Following the court's entry, Norcold filed a Motion for Modification and/or Reconsideration of the court's grant of summary judgment, which was denied.

[*P8]   From the trial court's May 20, 2002 grant of summary judgment to Gateway and December 13, 2002 grant of summary judgment to Dayco, Norcold appeals, asserting six assignments of error for our review. For purposes of brevity and clarity, we will combine our discussion of Norcold's third and fourth assignments of error. Because this appeal arises from summary judgment [**6] determinations, we will begin by setting forth our standard of review.

*Standard of Review*

[*P9]   Under Ohio law, a court may not grant a motion for summary judgment unless the record demonstrates: (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law; and (3) that, after considering the evidence most strongly in the nonmovant's favor, reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. n1 In ruling on a summary judgment motion, the trial court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmovant. n2 Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the adverse party. n3 Appellate review of summary judgment determinations is conducted on a de novo basis; n4 therefore, this court considers the motion independently [**7] and without deference to the trial court's findings. n5

n1 Civ.R. 56(C); *Horton v. Harwick Chemical Corp. (1985), 73 Ohio St.3d 679, 686-87, 1995 Ohio 286, 653 N.E.2d 1196.*

n2 *Good v. Krohn (2002), 151 Ohio App.3d 832, 834, 2002 Ohio 4001, 786 N.E.2d 480, at P7,* citing *Jacobs v. Racevskis (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653.*

n3 *Hannah v. Dayton Power & Light Co. (1998), 82 Ohio St.3d 482, 485, 1998 Ohio 408, 696 N.E.2d 1044.*

2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

n4 *Griner v. Minster Bd. of Edn. (1998), 128 Ohio App.3d 425, 430, 715 N.E.2d 226.*

n5 *J.A. Industries, Inc. v. All American Plastics, Inc. (1999), 133 Ohio App.3d 76, 82, 1999 Ohio 817, 726 N.E.2d 1066.*

*Norcold's Claims Against Gateway*

Assignment of Error I

The trial court erred in granting Appellee Gateway's Motion for Summary Judgment as to Count I of Appellant Norcold's first amended complaint by finding that no genuine issue of material fact exists for resolution by a jury regarding Norcold's [**8] reliance on express warranties as a basis of its bargain with Gateway. [*P10] In its first assignment of error, Norcold contends that the trial court made impermissible credibility determinations as to whether Norcold relied upon Gateway's express warranties concerning the tap tee. Neither party contests that affirmations of fact or promise were made by Gateway to Norcold within the purchase orders for the tap tees; therefore, the only issue to be decided by this court is whether the trial court erred in finding that the language therein was not part of the basis of the bargain between the parties.

[*P11] In purchasing the tap tees from Gateway, Norcold furnished purchase orders containing the following applicable language:

1. ACCEPTANCE AGREEMENT. Seller's commencement of work on the goods subject to this purchase order or shipment of such goods, whichever occurs first, shall be deemed an effective mode of acceptance of this purchase order. Any acceptance of this purchase order is limited to acceptance of the express terms contained on the front and back hereof.

* * *

5. WARRANTY. Seller expressly warrants that all goods or services furnished under this agreement [**9] shall conform to all specifications and appropriate standards, will be new, and will be free from defects in material or workmanship. * * * Seller warrants that all goods or services furnished hereunder will be merchantable, and will be safe and appropriate for the purpose for which goods or services of that kind are normally used. If seller knows or has reason to know the particular purpose for which purchaser intends to use the goods or services, seller warrants that such goods or services will fit for such particular purpose. Seller warrants that goods or services furnished will conform in all respects to samples, inspection, test, acceptance or use of the goods or services furnished hereunder. Such warranties shall survive inspections, tests, acceptance and use. Seller's warranty shall run to purchaser, its successors, assigns and customers, and users of products sold by purchaser. Seller agrees to replace or correct defects of any goods or services not conforming to the foregoing warranty promptly, without expense to purchaser, when notified of such nonconformity by purchaser, provided purchaser elects to provide seller with the opportunity to do so. In the event of failure of [**10] seller to correct defects in or replace nonconforming goods or services promptly, purchaser, after reasonable notice to seller, may make such corrections or replace such goods and services and charge seller for the cost by purchaser in doing so.

* * *

17. ENTIRE AGREEMENT. This purchase order, and any documents referred to on the face hereof, constitute the entire agreement between the parties. [*P12] With respect to express warranties, *R.C. 1302.26* (U.C.C. § 2-313) provides, in pertinent part:

(A) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

* * *

(B) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. [*P13]    [**11] The trial court herein determined that the written warranties by Gateway did not become part of the basis of the bargain between the parties because Norcold did not actually rely on Gateway's representations. In doing so, the trial court relied upon *Price Brothers Co. v. Philadelphia Gear Corp.*, which mandated:

> in order to determine whether * * * pre-contract statements * * * were in fact a basis of the bargain and thus an express warranty, or whether they were merely a seller's 'puffing', the court should consider the circumstances surrounding the transaction, the reasonableness of the buyer in believing the seller, and the reliance placed on the seller's statements by the buyer. n6

n6 *(1981), 649 F.2d 416, 422* (citations omitted).

The trial court's reliance thereon, however, is misplaced. *Price Brothers* is distinguishable from the case at bar particularly because therein the court was determining whether pre-contract statements made by the seller, sales literature, and [**12] a journal article referring to the goods sold constituted affirmations of fact or promise. In other words, the court was merely "differentiating affirmations of fact from statements of opinion." n7 In contrast, the statements in this case were not pre-contractual representations but were integrated terms within the parties' written agreement. The parties do not dispute whether the affirmations within the purchase orders constitute statements of fact or promise; their arguments entail whether the statements or affirmations were part of the basis of the bargain.

n7 *Pratt v. Bowling (Sept. 14, 1983), Clinton App. No. CA 489, 1983 Ohio App. LEXIS 15934.* See, also, *Slyman v. Pickwick Farms (1984), 15 Ohio App.3d 25, 15 Ohio B. 47, 472 N.E.2d 380.*

[*P14] Because "basis of the bargain" is not a defined term, the language has caused significant legal confusion with regard to whether a buyer's reliance upon express warranty language is a necessary part of determining the enforcement thereof. Prior to the adoption of the Uniform Commercial [**13] Code ("UCC") in Ohio, reliance was a key inquiry as to the enforceability of an express warranty: "an express warranty is an affirmation of fact by the seller as to a product or commodity to induce the purchase thereof, on which affirmation the buyer relies in making the purchase." n8 Notably, some Ohio Appellate Courts have continued to evaluate the enforceability of express warranties by requiring the buyer's reliance thereon, despite the absence of such language in *R.C. 1302.26.* n9 However, these cases deal with affirmations of fact or promise during contract negotiation and not those contained in a written agreement. The parties cite no Ohio cases, nor has this court uncovered any, in which Ohio courts have grappled with the question of reliance in the context of an express written warranty.

n8 *Rogers v. Toni Permanent Co., (1958), 167 Ohio St. 244, 147 N.E.2d 612,* paragraph two of the syllabus.

n9 See, e.g., *Pratt, supra.*

[*P15] In order for this court [**14] to shed light on the meaning of "basis of the bargain," in the context of written affirmations of fact or promise in a valid contract, and any concomitant reliance requirement, we must turn to the Official Comments of the UCC for guidance. Although a review of UCC section 2-313's comments does not definitively answer whether reliance remains a necessary element for enforcement of an express warranty, the comments do seem to indicate that reliance is not required in the context of this case. Comment 3 states:

> the present section deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, *exactly as any other part of a negotiation which ends in a contract is dealt with.* No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires [**15] clear affirmative proof. The issue normally is one of fact. n10

n10 Official Cmt. 3 to UCC 2-313.

Thus, comment 3 indicates that UCC section 2-313 is relevant to the question of whether an express warranty has been *created*, and the "basis of the bargain" rule is not applicable to situations where written warranties are clear and express. A decisive majority of courts that have considered this issue have reached the similar conclusion that reliance is not an element in a claim for breach of an express written warranty. n11

n11 See, e.g., *Southern Broadcast Group, LLC v. Gem Broadcasting, Inc. (M.D.Florida 2001), 145 F. Supp. 2d 1316, 1321, 1324* (Florida law); *Continental Sand & Gravel, Inc. v. K & K Sand & Gravel, Inc. (C.A.7 1985), 755 F.2d 87, 90 n. 2* (Illinois law); *Wikoff v. Vanderveld (C.A.7 1990), 897 F.2d 232, 240-41* (Illinois law); *Giuffrida v. American Family Brands, Inc. (E.D.Pa. Apr.23, 1998), 1998 U.S. Dist. LEXIS 5588,* No. CIV. A. 96-7062 (Pennsylvania law); *Pegasus Mgmt. Co., Inc. v. Lyssa, Inc.*

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 5 of 34

Page 5
2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

(D.Mass.1998), 995 F. Supp. 29, 39 (Connecticut law); *Glacier Gen. Assurance Co. v. Casualty Indem. Exch. (D.Mont.1977), 435 F. Supp. 855, 860-61* (Montana law); *CBS Inc. v. Ziff-Davis Publ'g Co. (1990), 75 N.Y.2d 496, 553 N.E.2d 997, 1000-01, 554 N.Y.S.2d 449* (New York law); *C.R. Anthony Co. v. Loretto Mall Partners (1991), 112 N.M. 504, 817 P.2d 238, 246* (New Mexico law); *Essex Group, Inc. v. Nill (Ind.App.1992), 594 N.E.2d 503, 506-07* (Indiana law); *Wechsler v. Long Island Rehab. Ctr. of Nassau, Inc.* (Mass.Super. Sept. 4, 1996), No. CIV. A. 93-6946-B (Massachusetts law).

[**16]

[*P16] Express warranties "are as much a part of the contract as any other term, and the right to damages on the breach depends on nothing more than the breach of warranty." n12 In other words, [a] warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past. n13

> n12 *Shambaugh v. Lindsay (Ind.App.1983), 445 N.E.2d 124, 126-27*, quoting *Glacier Gen. Assurance Co., 435 F. Supp. at 860-61*; *Lennar Homes, Inc. v. Masonite Corp. (E.D.La.1998), 32 F. Supp. 2d 396, 399*; *Southern Broadcast Group, LLC, 145 F. Supp. 2d at 1322*, quoting *CBS, Inc., 553 N.E.2d at 1001*.

> n13 *Metro. Coal Co. v. Howard (C.A.2 1946), 155 F.2d 780, 784*; *Shambaugh, 445 N.E.2d at 127*.

[**17]

Accordingly, because the warranties in this case were part of a written contract, we find that enforcement thereof is not dependant upon any reliance by Norcold. As such, we must sustain Norcold's first assignment of error.

Assignment of Error II

The trial court erred in granting Gateway's motion for summary judgment as to Norcold's claim for breach of an implied warranty of merchantability by using a standard outside Ohio *R.C. § 1302.27*.

[*P17] Norcold alleges that Gateway breached the implied warranty of merchantability because the tap tee could not and did not pass without objection in the trade under the contract description and was not fit for its ordinary use. Norcold further argues that the trial court improperly considered that the tap tee was a newly constructed part in determining whether Gateway breached the implied warranty of merchantability

[*P18] *R.C. 1302.27*, in pertinent part, states the following with regard to the implied warranty of merchantability:

**(A) Unless excluded or modified as provided in section 1302.29 of the Revised Code, a warranty that the goods [**18] shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * ***

**(B) Goods to be merchantable must be at least such as:**

**pass without objection in the trade under the contract description; and**

* * *

**(3) are fit for the ordinary purposes for which such goods are used[.]**

In other words, this warranty is breached when goods are not of an acceptable quality when compared to that generally acceptable in the trade for goods of the kind. n14

> n14 *R.C. 1302.27*, Official Cmt. 2; *Price Bros. Co., 649 F.2d at 424*.

[*P19] The evidence in this case indicates that Norcold approached Gateway with a specific request to combine two pre-existing parts into a single component. Norcold negotiated with Gateway and provided sketches of the proposed part so that Gateway could then ascertain whether the part could be manufactured. The uncontroverted evidence reveals that the tap tee was a newly created [**19] component made especially for Norcold. Under these circumstances, "no average or usual standards for determining ordinary performance or quality for the components can be determined" because the parts had never previously been manufactured. n15 Additionally, there was no showing that the parts were not "such as pass without objection in the trade under the contract description," for there was no trade in goods of the same kind. n16

2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

n15 See *Price Bros. Co.,* 649 F.2d at 424; *Binks Mfg. Co. v. Natl.Presto Industries, Inc.* (1983), 709 F.2d 1109, 1122.

n16 *Axion Corp. v. G.D.C. Leasing Corp.* (1971), 359 Mass. 474, 269 N.E.2d 664, 670.

[*P20] Accordingly, we find that the trial court did not err in considering that the tap tee was a newly constructed part, as such is directly relevant to *R.C. 1302.27(B)(1)* and *(3)*. Thus, we overrule Norcold's second assignment of error.

Assignment of Error III

The trial court erred in granting [**20] Gateway's motion for summary judgment on Norcold's claim for breach of an implied warranty of fitness for a particular purpose by imposing a standard outside Ohio *R.C. 1302.28.*

Assignment of Error IV

The trial court erred in granting Gateway's motion for summary judgment as to count III of Norcold's first amended complaint by weighing the evidence and by determining that any reliance by Norcold upon Gateway to furnish goods fit for a particular purpose was unreasonable.    [*P21] For its third and fourth assignments of error, Norcold claims that the trial court erred by using standards outside *R.C. 1302.28* and by improperly weighing the evidence in determining whether Norcold relied on Gateway to furnish goods fit for its particular purpose.

[*P22] With respect to implied warranties of fitness for a particular purpose, *R.C. 1302.28* provides, in relevant part:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is * * * an [**21] implied warranty that the goods shall be fit for such purpose.

Thus, the test for finding an implied warranty of fitness for a particular purpose requires that 1) the seller knew of the buyer's particular purpose; 2) that the seller had reason to know that the buyer is relying on the seller's skill or judgment to furnish or select the appropriate goods; and 3) the buyer must rely upon the seller's skill or judgment. n17 Additionally, the buyer's expertise or potentially superior knowledge with regard to the goods sold is a relevant factor to weigh into the reliance analysis. n18

n17 *Acme Steak Co. v. Great Lakes Mechanical Co., Mahoning App. Nos. 98-C.A.-146, 98-C.A.-243, 2000 Ohio 2566,* citing *Hollingsworth v. The Software House, Inc.* (1986), 32 Ohio App.3d 61, 65, 513 N.E.2d 1372.

n18 *Jatco, Inc. v. Charter Air Center, Inc.* (S.D.Ohio 1981), 527 F. Supp. 314, 319-20; *Price Brothers Co.,* 649 F.2d at 423-24.

[*P23] Herein, questions [**22] of material fact remain as to whether Norcold relied upon Gateway to furnish appropriate goods. Testimony indicates that Gateway was aware that the tap tees would be utilized in a propane gas line in Norcold's refrigerators. Gateway was approached by Norcold representatives who inquired as to whether a part could be manufactured for this specific application. Gateway then sought out a manufacturer, Dayco, to produce the part. Not until the tap tees began to malfunction did Norcold ever communicate with Dayco. Additionally, while Norcold did provide sketches of the proposed tap tee and the size necessary to accommodate their use, deposition testimony from Norcold employees and an affidavit from a former president of Norcold allege that they were relying on Gateway both to assure Norcold that the tap tees could be manufactured and to provide the requested component. In addition, the trial court precluded Norcold's claim for breach of the implied warranty for a particular purpose because of Norcold's alleged superior expertise and knowledge concerning the tap tee; however, in light of the evidence and in taking all reasonable inferences in Norcold's favor, we find that the trial court [**23] improperly weighed the evidence when making this determination. Thus, sufficient evidence establishes that material questions of fact remain and that reasonable minds could come to different conclusions as to whether Norcold relied upon Gateway to furnish appropriate goods.

[*P24] For these reasons, we sustain Norcold's third and fourth assignments of error.

*Norcold's Claims Against Dayco*

Assignment of Error V

The trial court erred in granting Appellee Dayco's motion for summary judgment as to Count V of Appellant Norcold's second amended complaint by determining that Ohio does not provide a common law remedy to a commercial purchaser of a defective product for commercial loss.

[*P25] Norcold asserts in its fifth assignment of error that the trial court erred in finding as a matter of law that absent privity of contract, a commercial purchaser of a defective product cannot maintain a claim for purely

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 7 of 34

Page 7

2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

economic loss under common law tort theories of recovery. Based upon the following, however, we affirm the judgment of the trial court.

[*P26]  In *Iacono v. Anderson Concrete Corp.*, the Ohio Supreme Court held that a homeowner could sue in tort under [**24] implied warranty theories to recover property damages against the supplier of defective driveway material with whom the plaintiff was not in privity of contract. n19 Thereafter, in *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, the Court noted that "while the damages sustained in *Iacono* were described as 'property' damage, they were in fact merely defects in the product itself which reduced the product's value, *i.e.*, economic damages." n20 Following these decisions, the Court, in *La Puma v. Collinwood Concrete*, reaffirmed the existence of a noncommercial consumer plaintiff's common-law products liability claim, based upon implied warranty theory, to recover purely economic damages from a product supplier with whom the plaintiff was not in privity. n21

> n19 *(1975), 42 Ohio St.2d 88, 93, 326 N.E.2d 267*.

> n20 *(1989), 42 Ohio St.3d 40, 49, 537 N.E.2d 624*.

> n21 *75 Ohio St.3d 64, 67, 1996 Ohio 305, 661 N.E.2d 714*. See, also, *Midwest Ford, Inc. v. C.T. Taylor Co., Inc. (1997), 118 Ohio App.3d 798, 802, 694 N.E.2d 114*, appeal not allowed by, *79 Ohio St. 3d 1457, 681 N.E.2d 440*.

[**25]

[*P27]  The issue before this court, however, is whether the same cause of action should be available to commercial buyers of products who claim purely economic loss from product suppliers with whom they are not in privity. Both the Ninth and Tenth Appellate Districts in Ohio have reached contrary results in deciding this precise issue. n22 However, based upon the following, we find the Ninth District's rationale in *Midwest Ford, Inc. v. C.T. Taylor Company, Inc.* to be persuasive in this case.

> n22 See *Midwest Ford, Inc., 118 Ohio App.3d at 798; Ohio Dept. of Adm. Serv. v. Robert P. Madison Internatl., Inc. (2000), 138 Ohio App.3d 388, 741 N.E.2d 551*.

[*P28]  The Supreme Court, in *Chemtrol*, explained that an action in tort for breach of express or implied warranty is synonymous with strict liability. n23 Typically, the rights and duties of a buyer and seller are

determined by the law of sales, or the U.C.C. n24 In contrast, "strict liability evolved as a judicial [**26] response to inadequacies in sales law with respect to consumers who sustained physical injuries from defective goods made or distributed by remote parties in the marketing chain." n25 Thus, in order to determine whether a commercial buyer may recover economic loss, we must look to the policy considerations underlying strict liability and those underlying the U.C.C., which include, inter alia, the relative bargaining power of the parties and the allocation of loss to the better risk-bearer in a modern marketing system. n26

> n23 *Chemtrol, 42 Ohio St.3d at 49*. See, also, *Midwest Ford, Inc., 118 Ohio App.3d at 803-805; Bobb Forest Prod., Inc. v. Morbark Indust., Inc., 151 Ohio App.3d 63, 2002 Ohio 5370, 783 N.E.2d 560, P56*.

> n24 *Midwest Ford, Inc., 118 Ohio App.3d at 804*, quoting *Spring Motors Distrib. v. Ford Motor Co. (1985), 98 N.J. 555, 575-577, 489 A.2d 660*.

> n25 *Id.*

> n26 *Id.*

[*P29]  Herein, both Norcold [**27] and Dayco have, at the very least, comparable bargaining power as commercial entities. n27 Furthermore, perfect parity is not necessary to a determination that parties have substantially equal bargaining positions. n28 Additionally, Norcold is as well situated as Dayco to assess the impact of economic loss. n29 Indeed, a commercial buyer, such as Norcold, may be better situated than the manufacturer to factor into its price the risk of loss caused by the purchase of a defective product. n30 Permitting suit against Dayco for strict liability for purely economic damages potentially shifts costs to Dayco's other customers, be they noncommercial buyers or commercial buyers who manage contractual economic risks more conservatively than Norcold. n31

> n27 *Id.*

> n28 *Id.*

> n29 *Id.*

> n30 *Id.*

> n31 *Id.*

2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

[*P30] Additionally, the policies of product liability law as articulated by Ohio courts would not be served by extending a strict-liability cause of action to commercial plaintiffs. The [**28] Ohio Supreme Court has explained the policy considerations for applying strict liability in cases of defective products, including that human life and safety are promoted by subjecting manufacturers of defective products to strict liability, that manufacturers are in a better position than those injured to internalize and redistribute the cost of injuries, and that strict liability relieves the "average consumer" of the burden of proving negligence. n32 None of these policy considerations are applicable to a claim by a commercial buyer for purely economic losses. n33

> n32 *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp. (1995), 73 Ohio St.3d 609, 621, 1995 Ohio 285, 653 N.E.2d 661.*

> n33 *Midwest Ford, Inc., 118 Ohio App.3d at 805.*

[*P31] Therefore, for the foregoing reasons, we hold that absent privity of contract, a commercial purchaser of a defective product cannot maintain a claim for purely economic loss under common law tort theories of recovery. Accordingly, Norcold's claim [**29] against Dayco under implied warranty theories in tort is barred as a matter of law, and Norcold's fifth assignment of error is hereby overruled.

Assignment of Error VI

The trial court erred in denying Norcold's motion for modification and/or reconsideration of the decision and order entry granting summary judgment in favor of Dayco because Norcold's second amended complaint was an adequately "short and plain statement of (its) claim" under Civil Rule 8(A) to allow it to recover under Ohio's common law for consequential damages due to a breach of express and implied warranties. [*P32] For its final assignment of error, Norcold maintains that the trial court erred in limiting its cause of action against Dayco to implied warranty theories in tort. Norcold claims that it sufficiently pled claims under both implied warranty in tort and contract. However, based upon the pleadings herein, we affirm the determination of the trial court.

[*P33] At the outset, we note that in order to maintain a contract-based claim for breach of implied warranties there must be a contractual relationship, or privity of contract, between the parties. n34 Herein, there is no dispute that Norcold [**30] and Dayco did not have a contractual relationship. However, courts have recognized that privity will lie between a manufacturer and an ultimate consumer if either the manufacturer is so involved in the sales transaction that the distributor merely becomes the manufacturer's agent or if the consumer is an intended third-party beneficiary to a contract. n35

> n34 *Lawyers Cooperative Publishing, Co. v. Muething (1992), 65 Ohio St.3d 273, 277, 603 N.E.2d 969; Bobb Forest Prod., Inc. v. Morbark Industries, Inc., 151 Ohio App.3d 63, 2002 Ohio 5370, 783 N.E.2d 560, P 56, citing U.S. Fid. & Guar. Co. v. Truck & Concrete Equip. Co. (1970), 21 Ohio St.2d 244, 257 N.E.2d 380.*

> n35 *Bobb Forest Prod., Inc., 151 Ohio App.3d at P 57-58;* See, also, *Mettler-Toledo, Inc. v. Wysong & Miles Co.* (Nov. 9, 1999), 10th Dist. No. 98*AP-1462, 1999 Ohio App. LEXIS 5255; Am. Rock Mechanics, Inc. v. Thermex Energy Corp. (1992), 80 Ohio App.3d 53, 608 N.E.2d 830.*

[*P34] [**31] Keeping these principles in mind, we now turn to discuss whether Norcold sufficiently pled a claim against Dayco for breach of implied warranty in contract. Civ.R. 8(A) requires "only that a pleading contain a short and plain statement of the circumstances entitling the party to relief. A party is not required to plead the legal theory of recovery or the consequences which naturally flow by operation of law from the legal relationships of the parties." n36 In other words, it is sufficient if a plaintiff sets forth facts which, if proven, would establish their claim for relief. n37 The purpose of including sufficient operative facts in a complaint is to provide fair notice to the defender of the claim. n38

> n36 *Illinois Controls, Inc. v. Langham, 70 Ohio St.3d 512, 526, 1994 Ohio 99, 639 N.E.2d 771.*

> n37 *Id.*

> n38 *Fed. Land & Bank Assn. v. Walton (June 16, 1995), Wyandot App. No. 16-94-9, 1995 Ohio App. LEXIS 2532, citing Civ. R. 8(A) and DeVore v. Mut. of Omaha Ins. Co. (1972), 32 Ohio App.2d 36, 288 N.E.2d 202.*

[**32]

[*P35] Norcold's second amended complaint does not allege that it had a contractual relationship with Dayco. Additionally, the complaint fails to factually describe the requisite relationship between Norcold and Dayco to establish privity between them. We also find it noteworthy that in its motion to reconsider the trial court's

2003 Ohio 4252, *; 2003 Ohio App. LEXIS 3772, **;
CCH Prod. Liab. Rep. P16,715; 51 U.C.C. Rep. Serv. 2d (Callaghan) 88

denial of its request to amend its complaint, Norcold conceded that no privity existed between it and Dayco. Moreover, Norcold's motion for leave to file a second amended complaint stated that the purpose for amending the complaint was to "separate the claims against * * * Gateway * * *, which are contractual in nature, from those against Dayco * * *, which are based in tort." Accordingly, we find that the trial court did not err in limiting Norcold's cause of action to tort theories of recovery.

[*P36] Norcold's sixth assignment of error is overruled.

[*P37] Having found prejudicial error to Appellant herein, in the particulars assigned and argued, the judgment of the trial court is reversed insofar as it relates to issues concerning express warranty and the implied warranty of fitness for a particular purpose, the matter is remanded for [**33] further proceedings in accordance with this opinion.

*Judgment affirmed in part, reversed in part, and cause remanded.*

**SHAW and CUPP, JJ., concur.**

PLAINTIFF'S
EXHIBIT

B

tabbies


1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
2                      WESTERN DISTRICT

3

4

5       PATRICIA A. DAFFIN, et al.,:

6                  Plaintiffs.      :

7       vs.                         :      Case No. C-1-00-458

8       FORD MOTOR COMPANY,         :

9                  Defendant.       :

10

11

12             Deposition of Patricia A. Daffin, a Plaintiff

13      herein, taken as upon direct examination by the Defendant,

14      and pursuant to the Federal Rules of Civil Procedure,

15      agreement of counsel, and stipulations hereinafter set forth,

16      at the offices of Thompson, Hine & Flory, LLP, 312 Walnut

17      Street, Suite 1400, Cincinnati, Ohio, 45202-4029, at 9:58

18      a.m., on the 5th day of April, 2001, before Ann Belmont, RPR,

19      a Notary Public, for the State of Ohio.

20

21

22

23           Tri-County Court Reporting and Videotape Service

24                     95 SOUTH FOURTH STREET
                         BATAVIA, OHIO 45103
25                         (513) 732-1477



1    some of the other things that someone who was familiar with

2    an engine might.  I know that George discussed some things

3    with him that I would not be familiar with as such.  We

4    talked about just the generalities of a consumer making a

5    purchase.

6            Q.   Do you recall Mr. Burdett saying anything at

7    all about the reliability of the Mercury Villager?

8            A.   I couldn't quote him, but it certainly was part

9    of the -- shall we say, sales pitch.

10           Q.   And did -- generally, did he tell you that the

11   Mercury Villager was a reliable vehicle?

12           A.   I wouldn't quote him at all.

13               MR. MURDOCK:  Objection as to form, go ahead.

14               THE DEPONENT:  I can't quote it, I just know

15   that that was what was inferred, I can't quote it.

16   BY MR. NIBLOCK:

17           Q.   Did you discuss the warranty with Mr. Burdett

18   prior to purchasing the vehicle?

19           A.   Yes.

20           Q.   And what did he tell you about that?

21           A.   He gave us a brochure that listed everything

22   that a warranty covers and does not cover.  Was a three-year

23   36,000 mile bumper to bumper warranty that covered everything

24   and we also discussed the extended plan, which we purchased.

25           Q.   Did you read the warranty brochure before you

TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

1    purchased the vehicle?

2         A.    Very definitely.

3         Q.    And did you read the materials about the

4    extended service plan --

5         A.    Very definitely.

6         Q.    -- before you purchased the vehicle?

7         A.    (Deponent nods head.)

8         Q.    You're nodding --

9         A.    That's what we took home that night.   That's

10   what we took home and went over.

11              MR. MURDOCK:   Just let him finish his question

12   before you go there, you're doing fine.

13   BY MR. NIBLOCK:

14        Q.    Can you recall anything else specifically that

15   Mr. Burdett said about the Mercury Villager or about Ford

16   vehicles generally?

17        A.    Not specifically.

18        Q.    Generally?

19        A.    Well, he portrayed it as the best.

20        Q.    In making the decision to purchase a Mercury

21   Villager did you rely on the statements that Mr. Burdett

22   made?

23        A.    Did we ex -- well, when you say did we rely,

24   did we believe him?  We believed that's what Ford was

25   standing behind, yes.

40

1  Villager?

2      MR. MURDOCK:  Objection as to form, vague.  Go

3  ahead answer.

4      THE DEPONENT:  Did we have -- we had dialogue,

5  a communication, interaction, his feelings, my feelings, came

6  up with a consensus.

7  BY MR. NIBLOCK:

8      Q.   Was one of you more inclined than the other to

9  purchase the Villager?

10     A.   I wouldn't say so.

11     Q.   Do you know if Mr. Burdett did -- I'm sorry,

12  I've forgotten George's last name.

13     A.   Ohntrup.

14     Q.   Ohntrup, did any of his own independent

15  research into the Villager prior to the purchase?

16     A.   I don't know that he did, but I can't answer

17  that specifically.

18     Q.   Did price play a factor in your decision to

19  purchase the vehicle?

20     A.   It was a factor, we had a range of cost we were

21  willing to live within.

22     Q.   I'm sorry if I have already asked this

23  question, I apologize, but you said you reviewed the warranty

24  information that Mr. Burdett gave you prior to purchasing the

25  vehicle.  Was that warranty an important consideration for

41

1    you in purchasing the vehicle?

2              A.    Yes, I would say so.

3              Q.    To your recollection did that warranty vary

4    significantly from the warranties that other manufacturers

5    were offering for their vehicles?

6              MR. MURDOCK:  Objection as to form, vague.  Go

7    ahead answer.

8              THE DEPONENT:  I can't compare to anybody else,

9    I had nothing to compare it to.

10   BY MR. NIBLOCK:

11             Q.    So you haven't looked at the warranties of

12   others --

13             A.    We hadn't looked at the warranties.

14             Q.    Was safety a consideration for you in

15   purchasing your vehicle?

16             A.    Absolutely.

17             Q.    How important was it to you that the vehicle be

18   safe?

19             A.    My opinion it's the first consideration.

20             Q.    And did you believe at the time you purchased

21   the vehicle that your Villager was safe?

22             A.    Definitely did believe it.

23             Q.    Do you believe that today your Villager is

24   safe?

25             A.    No, I do not.

```
1                          (A break was taken.)

2       BY MR. NIBLOCK:

3             Q.    Ms. Daffin, what express warranties do you

4       contend that Ford gave you regarding your Villager?

5             A.    That the vehicle was free of defects from

6       bumper to bumper.

7             Q.    Can you point to anything in the written

8       warranty that says that the vehicle would be free of defects

9       from bumper to bumper?

10            A.    I believe it's contained in the materials of

11      which there are copies of here.

12            Q.    Okay.

13            A.    Where they talk about their warranty and the

14      fact that you have bumper to bumper coverage for everything

15      in between.  They are warranting everything that's on there.

16            Q.    Why don't we turn to DAAF DPI0072.

17            MR. MURDOCK:  What page?

18      BY MR. NIBLOCK:

19            Q.    It starts at 0072 the warranty itself.  I was

20      trying to pull the whole thing out, it's all stapled, all

21      right.  If I could ask you to turn to page DPI0078, there's a

22      section there that at the top under bumper to bumper coverage

23      the middle paragraph there says, "During this coverage period

24      authorized Ford Motor Company dealers will repair, replace or

25      adjust all parts on your vehicle except tires that are
```

1    defective in factory supplied materials or workmanship." Is

2    that the statement that you're relying on when you say that

3    Ford promised that you would be given a defect free vehicle?

4         A.   I don't know that that's the only place it's

5    referred to.   I wouldn't be able to say specifically without

6    going back through a number of these things.   There's more

7    than one place where they refer to the warranty.   They are

8    saying that are defective in factory supplied materials or

9    workmanship.   I don't know what you're inferring, I mean,

10   that tells me that everything is supposed to be warranted.

11        Q.   I guess I'm wondering if you believe there's a

12   difference between receiving a vehicle that is defect free

13   and receiving a warranty that if there is a defect in your

14   vehicle it will be repaired?

15        MR. MURDOCK:   Again, I'll object with regard to

16   these questions from a layperson, calls for legal conclusions

17   with regard to the rights and obligations under this written

18   warranty especially how these questions are phrased I think

19   it's misleading.   But go ahead and answer if you can please.

20        THE DEPONENT:   It's warranted against defective

21   materials of workmanship.   Now, that is without defects, I

22   mean, I don't know any other way to answer it.   I mean,

23   saying the same thing as far as I'm concerned, I mean.

24   BY MR. NIBLOCK:

25        Q.   Okay.   Other than the 1999 model warranty guide

121

1      A.    Yes.

2      Q.    Do you believe that everyone who purchased a

3  Villager 1999 through 2001 Villager got the same warranty

4  that you did?

5      A.    The basic 36-month, 36, yeah, 36 months, 36,000

6  miles, yes.

7      Q.    And would it be your understanding that not

8  every purchaser of those vehicles purchased the extended

9  service plan?

10      A.    More than likely.

11      Q.    Were there any other expressed warranties that

12  were made to you other than the warranty booklet we looked at

13  earlier and DPI003 and DPI008?

14      A.    Not that I can recall or know at this moment

15  that I can say yes, I mean, I don't know that there was.

16      Q.    Are you basing your express warranty claims on

17  any statements that were made to you?

18      A.    Say that again.

19      Q.    Are you basing your express warranty claims on

20  any statements that were made to you?

21      MR. MURDOCK:   Objection as to form, vague.  Go

22  ahead and answer.

23      THE DEPONENT:   Only to the extent that it was

24  presented to me that the warranty that was all spelled out

25  that was handed to me, explained by the salesman what it

1    covered and what it did and the term used repeatedly bumper

2    to bumper warranty that I was inexplicitly convinced that I

3    had an expressed warranty on that vehicle to be without

4    defect and if there were a defect it would be re -- taken

5    care of.

6    BY MR. NIBLOCK:

7            Q.    And did Ford breach its expressed warranty to

8    you?

9            A.    Yes.

10           Q.    How did it do that?

11           A.    It did not repair and replace the defective

12   part for a period of that time that we were attempting to get

13   it done.

14           Q.    Okay.

15           A.    Also the fact that based on the difficulty and

16   obtaining the part it was very evident that this was a part

17   that was unavailable, the responses from the service people

18   indicated this was a wide spread problem all the way out to

19   California and that my belief is that Ford knew all this at

20   that time.

21           MR. MURDOCK:  I'm also going to object with

22   regard to the question calling for legal conclusion with

23   regard to the ongoing problem.

24   BY MR. NIBLOCK:

25           Q.    Is it your understanding that the warranty on

PLAINTIFF'S
EXHIBIT
_C_
tabbies



LEXSEE

**George Duran, Sr., et al., Plaintiffs, v. AT&T Corp., et al., Defendants, Communications Workers of America, and International Brotherhood of Electrical Workers, and International Brotherhood of Electrical Workers, Local 2020, Non-Aligned Parties.**

**Case No. C-2-99-418**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2000 U.S. Dist. LEXIS 21814; 168 L.R.R.M. 2456*

**August 31, 2000, Decided**
**August 31, 2000, Filed**

**DISPOSITION:** [*1] Defendants' motion for judgment on the pleadings was granted, with the exception that the individual named plaintiffs will be permitted to assert an estoppel argument in connection with their breach of contract claim in Count I.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** FOR GEORGE DURAN, Sr, MACARTHUR GREENE, JOHN NMI ROSS, AMELIA LIGHTNER, KENNETH ARSENAULT, PATRICIA HALE, ERNEST J HOLQUIN, WILLIAM D HUDSON, Sr, CARLOS P LOPEZ, plaintiffs: Reuben A Guttman, Brian P McCafferty, Provost & Umphrey, Washington, DC.

For GEORGE DURAN, Sr, MACARTHUR GREENE, JOHN NMI ROSS, AMELIA LIGHTNER, KENNETH ARSENAULT, PATRICIA HALE, ERNEST J HOLQUIN, WILLIAM D HUDSON, Sr, CARLOS P LOPEZ, plaintiffs: Ann Louise Lugbill, Cincinnati, OH.

For AT&T CORP, defendant: Charles C Jackson, Sari M Alamuddin, Seyfarth & Shaw, Chicago, IL.

For AT&T CORP, defendant: Thomas Louis Rosenberg, Ulmer & Berne, Columbus, OH.

For INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, defendant: Robert D Kurnick, Sherman Dunn Cohen Leifer & Yellig PC, Pat Shea, Washington, DC.

For INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, defendant: Michael John Hunter, Hunter Carnahan & Shoub, Columbus, OH.

For LOCAL 2020, IBOE, defendant: [*2] Jerry Alan Spicer, Snyder Rakay & Spicer, Dayton, OH.

For LUCENT TECHNOLOGIES INC, intervenor-defendant: Sari M Alamuddin, Seyfarth & Shaw, Chicago, IL.

**JUDGES:** James L. Graham, United States District Judge.

**OPINIONBY:** James L. Graham

**OPINION:**

OPINION AND ORDER

This is an action for breach of a collective bargaining agreement brought against defendants AT&T Corp. and its successor, Lucent Technologies. The plaintiffs in the above case are production occupation level employees of AT&T Corp. ("AT&T") or Lucent Technologies ("Lucent") and are present or former members of the Communication Workers of America ("CWA"). CWA is one of two unions which has represented production occupation employees at the defendants' facilities, the other being the International Brotherhood of Electrical Workers ("IBEW").

Page 2

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

The plaintiffs allege that the defendants are obligated under a 1986 collective bargaining agreement between CWA and AT&T known as the MFG-3 Agreement to pay to the plaintiffs certain benefits referred to as Special Hourly Payment ("SHP") and Special Supplementary Wage Treatment ("SSWT") benefits. The plaintiffs further allege that since the payment of SHP and SSWT benefits was not required **[*3]** under the collective bargaining agreement between the defendants and IBEW, the defendants have refused to continue paying these benefits in cases where the employee has transferred from a CWA-represented facility to a production facility represented by IBEW.

In Count I of the Second Amended Complaint, the plaintiffs assert a claim pursuant to § 301 of the Labor Management Relations Act ("LMRA"), *29 U.S.C. § 185,* for breach of contract, specifically, the MFG-3 Agreement, alleging that the defendants breached the agreement by failing to pay plaintiffs the SHP and SSWT benefits to which they are allegedly entitled to under that agreement.

In Count II of the second amended complaint, the plaintiffs assert a claim of promissory estoppel. This claim is based on a letter dated June 12, 1986 from Robert E. Allen, then president-elect of AT&T (hereinafter the "Allen letter"), which was sent to AT&T employees during the course of a strike which preceded the signing of the MFG-3 Agreement. See Second Amended Complaint, Ex. 3. This letter discussed the company's contract offer which, at that point, had been rejected by the union. Plaintiffs assert that they relied **[*4]** on representations made in the Allen letter concerning SHP and SSWT payments to their detriment by agreeing to ratify the MFG-3 Agreement.

In Count III of the second amended complaint, the plaintiffs assert a claim for breach of fiduciary duty. The plaintiffs allege that the collective bargaining agreement between the plaintiffs and the defendant companies established a relationship giving rise to a fiduciary duty owed by the defendants to the plaintiffs, and that the failure to pay SHP and SSWT benefits constituted a breach of that fiduciary duty.

Counts IV and VI assert claims for fraud and fraud in the omission, respectively. The plaintiffs allege that the defendants made knowingly false representations in the collective bargaining agreements and the Allen letter concerning their entitlement to SHP and SSWT payments upon which the plaintiffs relied to their detriment.

Count V asserts a claim for breach of a strike agreement. The plaintiffs claim that statements made in the Allen letter concerning the payments of SHP and SSWT benefits to the plaintiffs "for as long as they are employed by the company" constituted a strike settlement agreement which is enforceable.

This matter **[*5]** is before the court on the motion of defendants AT&T and Lucent for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) with respect to Counts II through VI of the second amended complaint. Judgment may be granted under Rule 12(c) if a court determines that a moving party is entitled to judgment as a matter of law. *Astor v. International Bus. Machs. Corp., 7 F.3d 533, 538 (6th Cir. 1993); Bools v. General Electric Co., 70 F. Supp. 2d 829, 830 (S.D.Ohio 1999).* In making this determination, the court must accept as true all well-pleaded allegations in the pleadings of the opposing party. *Bools, 70 F. Supp. 2d at 830.*

I. Section 301 Pre-emption

The defendants have moved for judgment on the pleadings on Counts II through VI on the basis that these claims are state law claims which are pre-empted by § 301 of the LMRA. It is well established that § 301 of the LMRA pre-empts any state claim arising from a breach of a collective bargaining agreement. See *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985); Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962).* **[*6]** The purpose of this rule is to require that all claims raising issues of labor contract interpretation be decided under federal labor law so as to prevent inconsistent interpretations of collective bargaining agreements. *Lucas Flour, 369 U.S. at 103.* The LMRA authorizes the federal courts to develop a uniform body of federal substantive law governing the enforcement of collective bargaining agreements. *Franchise Tax Bd. of state of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1983).*

Pre-emption occurs when a decision on the state claim "is inextricably intertwined with consideration of the terms of the labor contract," *Lueck, 471 U.S. at 213,* and when application of state law to a dispute "requires the interpretation of a collective-bargaining agreement." *Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 407, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988).* In evaluating whether state law tort claims are pre-empted by federal law, this court must first determine whether proof of the state law claim requires interpretation of the collective bargaining **[*7]** agreement. *DeCoe v. General Motors Corp., 32 F.3d 212, 216 (6th Cir. 1994).* Next, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement instead of state law. Id. If either of these tests is satisfied, § 301 pre-emption is warranted. Id.

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 21 of 34

Page 3
2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

The defendants contend that the plaintiffs' claims in Counts II through VI of the second amended complaint are state law claims pre-empted by § 301. The plaintiffs contend that they did not intend to assert state law claims of promissory estoppel, breach of fiduciary duty, and breach of contract, specifically, an alleged strike settlement agreement, in Counts II, III and V, but rather that they are pursuing those claims under the federal common law applicable to § 301 contract actions. The plaintiffs agree that their claims of fraud in Count IV and fraud in the omission in Count VI are state law claims, but argue that they are not pre-empted. The court will address infra whether the plaintiffs may assert claims of promissory estoppel, breach of fiduciary duty and breach of a strike settlement agreement under federal common law. To the extent that Counts [*8] II, III and V may be construed as asserting claims under state law, the court will address the defendants' pre-emption arguments here.

A. Promissory Estoppel - Count II

To prove a claim of promissory estoppel under Ohio law, a plaintiff would be required to show the following elements: (1) there must be a clear and unambiguous promise; (2) the party to whom the promise was made must rely on it; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise must have been injured by the reliance. *Patrick v. Painesville Commercial Properties, Inc, 123 Ohio App. 3d 575, 583, 704 N.E.2d 1249 (1997).*

In Count II of the second amended complaint, the plaintiffs allege that they relied on statements in the Allen letter concerning SHP and SSWT benefits. In P66, the plaintiffs allege that AT&T, "by its conduct and language as outlined above, represented to Plaintiffs and the Class that were to receive, pursuant to the terms of the MFG-3 Agreement, SSWT and SWP [sic] payments for so long as they remained production occupation employees of AT&T." (Emphasis supplied). Ascertaining whether a clear and unambiguous promise was made and whether [*9] the plaintiffs were justified in relying on any such promises would require an examination of the Allen letter and the terms of the MFG-3 Agreement to determine to what extent they purported to grant rights to the plaintiffs and whether they were in conflict. Any state law claim of promissory estoppel is inextricably intertwined with the MFG-3 Agreement and would require an interpretation of that agreement. See *DeCoe, 32 F.3d at 216; Fox v. Parker Hannifin Corp., 914 F.2d 795, 801 (6th Cir. 1990).* The court concludes that to the extent that the plaintiffs' complaint may be construed as asserting a claim of promissory estoppel under Ohio law, that claim is pre-empted under § 301.

B. Breach of Fiduciary Duty - Count III

In P77 of the second amended complaint, the plaintiffs allege that "the collective bargaining agreement between Plaintiffs and Defendant established a relationship creating a fiduciary duty owed by Defendant to Plaintiffs." Thus, proof of this claim would require an interpretation of the MFG-3 Agreement, and the plaintiffs have alleged that the right which they are asserting was created by the collective bargaining agreement. [*10] See *DeCoe, 32 F.3d at 216.* Both these factors indicate that a state law claim of breach of fiduciary duty would be pre-empted under § 301. See *Williams v. WCI Steel Co., Inc., 170 F.3d 598, 607 (6th Cir. 1999)*(state law claim for breach of fiduciary duty pre-empted).

C. Fraud and Fraud in the Omission - Counts IV and VI

The plaintiffs acknowledge that their claims of fraud and fraud in the omission are state law claims, but they assert that these claims are based on the representations made in the Allen letter and that reference to the collective bargaining agreement is therefore unnecessary.

In order to establish their claims of fraud and fraud in the omission under Ohio law, the plaintiffs would have to prove the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or [*11] concealment, and (6) a resulting injury proximately caused by the reliance. *Russ v. TRW, Inc., 59 Ohio St. 3d 42, 49, 570 N.E.2d 1076 (1991).*

In P57(a) of the second amended complaint, the plaintiffs allege that "the agreements upon which Plaintiffs predicate their claims were collectively bargained agreements[.]" In P81 of Count IV, the fraud claim, the plaintiffs allege that the defendants "made actual material representations of fact that were false, namely that Plaintiffs and the class would receive SHP and [sic] and/or SSWT payments for so long as they remained production occupation employees of AT&T." This language tracks the language in the collective bargaining agreements, see Plaintiffs' Exs. 5, 6A, 7A-C, not the language in the Allen letter, which refers to payments being made "to employees for as long as they're employed by the company." In Count VI, fraud in the omission, the plaintiffs allege that AT&T did not inform them of a material fact, namely, that they would not receive SSWT and SHP benefits if they transferred to an IBEW location, in either the Allen letter or the joint collective bargaining agreement summary, before they voted to ratify [*12] the MFG-3 Agreement. Second Amended Complaint, PP96-98.

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 22 of 34

Page 4

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

According to the second amended complaint, any rights which the plaintiffs have to the SSWT and SHP payments are based on the MFG-3 Agreement and subsequent agreements. However, even assuming that the source of the plaintiffs' rights in the fraud claim is the Allen letter, whether the plaintiffs were defrauded would require an interpretation of the MFG-3 Agreement to determine what benefits the plaintiffs are actually entitled to under that agreement, and whether those benefits differed from those promised in the Allen letter. Likewise, to determine whether the fact that benefits would not be paid to employees who transferred to an IBEW facility was a material omission, it would be necessary to interpret the MFG-3 Agreement to ascertain what benefits are provided for under that agreement.

This case is similar to the situation in *Adkins v. General Motors Corp., 946 F.2d 1201, 1208-10 (6th Cir. 1991),* where the plaintiffs argued that they were induced by false representations to ratify a collective bargaining agreement which allegedly eliminated certain entitlements under a separate interim or "bridge" agreement. [*13] The court concluded that the plaintiffs' fraud claims were pre-empted because adjudication of the fraud claims would require a determination as to whether the "bridge" agreement conferred rights on plaintiffs which were not included in a subsequently ratified collective bargaining agreement, and whether the plaintiffs agreed to ratify the collective bargaining agreement due to a misrepresentation of those rights. *Id. at 1208-10.* The court concluded that the fraud claims would require an analysis of both the bridge agreement and the collective bargaining agreement and that the fraud claims were "so intertwined with the terms of the collective-bargaining agreements present in the case that they may not be separated." *Id. at 1209-1210.* See also *Fox, 914 F.2d at 802* (state law fraud claim pre-empted); *Terwilliger v. Greyhound Lines, Inc., 882 F.2d 1033, 1038 (6th Cir. 1989)* (fraud claim requiring construction of terms of collective bargaining agreement was pre-empted).

In order to prove their state law claims of fraud, the plaintiffs must show that any representations contained in the Allen letter were not superseded or [*14] contradicted by the terms of the collective bargaining agreement. Thus, the fraud claims are pre-empted under § 301 because their resolution is inextricably intertwined with and substantially dependent upon analysis of the terms of the collective bargaining agreement. See *Schuver v. MidAmerican Energy Co., 154 F.3d 795, 799 (8th Cir. 1998).*

D. Breach of Strike Settlement Agreement - Count V

In Count V of the second amended complaint, the plaintiffs allege that the Allen letter constituted an offer of benefits which was accepted by the CWA when it entered into the MFG-3 Agreement, thereby resulting in the formation of a binding strike settlement agreement.

The Supreme Court held in *Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 25-28, 7 L. Ed. 2d 503, 82 S. Ct. 541 (1962),* that a § 301 action need not be based on a collective bargaining agreement, but instead is broad enough to encompass suits based on other contracts, such as strike agreements, between an employer and a labor organization representing employees. See also *In re General Motors Corp., 3 F.3d 980, 983 (6th Cir. 1993)* [*15] (("The term 'contract' as used in section 301 of the LMRA is not limited to collective bargaining agreements, but can embrace understandings other than those usually understood as collective bargaining agreements.").

If the Allen letter constituted a strike agreement between AT&T and the CWA, as alleged by the plaintiffs, a violation of such an agreement could be challenged under § 301. Thus, any rights asserted through such a breach of contract claim would arise from a § 301 contract, and any state law claim for breach of contract would be pre-empted. Even if the Allen letter is not a § 301 contract, an analysis of this claim would require interpreting the terms of the Allen letter and the MFG-3 Agreement to determine what was actually agreed to between AT&T and the CWA. Further, "it will require a court to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a [labor contract]." *Jones v. General Motors Corp., 939 F.2d 380, 382-83 (6th Cir. 1991).* Any state law claim for breach of a strike settlement agreement is pre-empted in this case.

II. Garmon Pre-emption [*16]

The defendants further argue that the plaintiffs' claims of promissory estoppel, fraud, and fraud in the omission are preempted under *San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959).* Garmon pre-emption forbids state regulation of activities which would constitute unfair labor practices under § 8 of the National Labor Relations Act ("NLRA"), *29 U.S.C. § 158* within the jurisdiction of the National Labor Relations Board ("the Board").

The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner [v. Teamsters, Chauffeurs & Helpers Local Union No. 776 (A.F.L.), 346 U.S. 485, 98 L. Ed. 228, 74 S. Ct. 161 (1953))* or different from (as

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 23 of 34

Page 5

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

in Farmer [v. *United Brotherhood of Carpenters and Joiners of Am., Local 25, 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977)*) that which could have been, but was not presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction [**17**] necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the Garmon doctrine was designed to avoid.

*Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters, 436 U.S. 180, 197, 56 L. Ed. 2d 209, 98 S. Ct. 1745 (1978).*

In *Serrano v. Jones & Laughlin Steel Co., 790 F.2d 1279 (6th Cir. 1986),* the Sixth Circuit addressed the issue of whether the plaintiffs' fraud claims were subject to Garmon pre-emption. The court found that the district court properly held that the fraud claims concerned conduct arguably prohibited by § 8(d) of the NLRA, *29 U.S.C. § 158*(d), which requires an employer to bargain in good faith with respect to "wages, hours and other terms and conditions of employment[.]" *Id. at 1286* (noting that the fraud charges, which alleged that the employer did not bargain in good faith in obtaining concessions from the union in a labor agreement and fraudulently misled employees concerning the closing of plants, constituted violations of the employer's § 158(d) duty). The court went on state that [**18**] the "failure of an employer to bargain in good faith about terms and conditions of employment is not peripheral to the concerns of federal labor law; rather, it strikes at the heart of one of the basic concerns of that law." *Id. at 1287* (holding that the conduct at issue was not "a mere peripheral concern of the Act," quoting *Local 926, Int'l Union of Operating Engineers v. Jones, 460 U.S. 669, 676, 75 L. Ed. 2d 368, 103 S. Ct. 1453 (1983)).*

The conduct of AT&T alleges in Counts II, IV and VI of the second amended complaint arguably violates the duty to bargain in good faith as required under § 158(d). The conduct presented to the state court to support the promissory estoppel and fraud claims would be the same conduct which would have been presented to the NLRB to establish a violation of § 158(d). As in Serrano, such conduct would not be a "mere peripheral concern" of the NLRA.

The plaintiffs argue that Garmon pre-emption should not be applied in this case because they are currently represented by the IBEW, and the IBEW would not be able to assert claims on their behalf before the Board which were based on a CWA contract. It is true that [**19**] Garmon pre-emption should be applied only in situations

in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction himself or to induce his adversary to do so. *Parker v. Connors Steel Co., 855 F.2d 1510, 1517 (11th Cir. 1988).* However, the defendants correctly argue that the plaintiffs as individual employees could have filed a charge of unfair labor practice against AT&T with the Board. See 29 C.F.R. § 102.9 ("A charge that any person has engaged in or is engaging in any unfair labor practice affecting commerce may be made by any person.")

The court concludes that, insofar as the second amended complaint may be construed as asserting state law claims of promissory estoppel, fraud and fraud in the omission, such claims would be barred by the doctrine of Garmon pre-emption.

III. Federal Common Law Claims

The plaintiffs argue that they should be permitted to pursue their claims of promissory estoppel, breach of fiduciary duty, and breach of an alleged strike agreement as federal common law claims under § 301. The defendants argue that the plaintiffs have pleaded no more than state [**20**] law claims in Counts II, III and V of their complaint, and that they should not now be permitted to switch theories and pursue these claims as federal common law claims. However, at no place in the second amended complaint do the plaintiffs refer to their claims as being state law claims under Ohio law.

The only reference to these claims as state law claims noted by the defendants occurs in the "Order Regarding Class Certification", Doc. No. 52, which the defendants contend was a joint submission prepared by the parties and submitted to the court for approval. It is noted at page 6, footnote 3, that only Count I is included within the class certification, and that "the Court is not certifying plaintiffs' state-law claims for class treatment at this time." However, this language does not specify what these "state-law claims" are.

The legal theories pleaded in Counts II, III and V are theories which could be advanced under either state or federal law. The language in those counts gives the defendants notice of the general nature of the claims being asserted. The defendants particularly should have anticipated that the plaintiffs would seek to assert an estoppel theory in connection [**21**] with their § 301 claim because similarly situated employees did so against defendant AT&T in *Anderson v. AT&T Corp., 147 F.3d 467 (6th Cir. 1998),* relying on the same Allen letter at issue in this case. The problem here is that the defendants simply assumed that the claims in those counts were state law claims, when in fact the complaint does not so specify. The defendants could have filed a motion for more definite statement pursuant to Fed. R. Civ. P. 12(e),

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 24 of 34

Page 6

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

seeking to have the plaintiffs specify whether they were relying on federal or state law in asserting these claims, but they did not do so.

This court concludes that the fact that the plaintiffs did not specifically identify the claims in Counts II, III and V as federal common law claims does not preclude them from proceeding on those theories now. The court will now address the defendants' arguments as to whether they are entitled to judgment on the pleadings on those claims as federal common law claims.

A. Promissory Estoppel - Count II

The first issue is whether the plaintiffs may advance the promissory estoppel theory contained in Count II under federal common law. The plaintiffs rely on the Sixth [*22] Circuit's decision in *Anderson., 147 F.3d at 477,* where that court concluded that the "federal common law of contract applicable under the LMRA includes the doctrine of promissory estoppel." The defendants argue that this language is merely dicta. While this discussion may have been unnecessary to the resolution of the issues presented in Anderson, that case relied on *Apponi v. Sunshine Biscuits, Inc., 809 F.2d 1210, 1217 (6th Cir. 1987),* where the Sixth Circuit had previously held that "the equitable doctrines of estoppel and waiver are applicable in a section 301 action to enforce a labor contract." See also *Frech v. Pensacola S.S. Ass'n, 903 F.2d 1471, 1475-76 (11th Cir. 1990)*(plaintiffs entitled to recover on estoppel theory even if representations relied on did not constitute a § 301 contract which was independently enforceable).

This court concludes that in the Sixth Circuit, the theory of estoppel may be asserted in support of a § 301 contract claim. As the court in Anderson observed, "there is nothing in our cases that excludes the various doctrines of estoppel from the federal common law of contract [that] [*23] governs suits brought under the LMRA." *Anderson, 147 F.3d at 477.* However, the Anderson court also noted that the plaintiffs in that case did not seek to assert estoppel as an independent claim for relief, but rather that AT&T should be "'estopped from denying' that it is liable for future wage-supplement payments to plaintiffs" for purposes of the plaintiffs' breach of contract claim under § 301. Id.

Thus, while an estoppel theory may be advanced in support of a § 301 breach of contract claim, estoppel may not be asserted as an independent claim for relief. To the extent that the plaintiffs have attempted to do so by pleading their estoppel theory in a separate count, that count must be dismissed.

The opinion in Anderson indicates that a promissory estoppel theory may be argued in support of a § 301 breach of contract claim. Count I, the plaintiffs' § 301

breach of contract claim, has been certified as a class action by the court. However, the plaintiffs pleaded their promissory estoppel claim as a separate count, Count II, and did not seek class certification on that count. Thus, the propriety of certifying the promissory estoppel claim for class [*24] action treatment has never been briefed by the parties.

Significant legal issues would need to be addressed in determining whether to certify the promissory estoppel theory as a part of the class action. The Sixth Circuit has stated that "because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment." *Sprague v. General Motors Corp., 133 F.3d 388, 398 (6th Cir. 1998).* See also, *Jensen v. SIPCO, Inc., 38 F.3d 945, 953 (8th Cir. 1994)*("If estoppel is an available doctrine, it must be applied with factual precision and therefore is not a suitable basis for class-wide relief.") One element of estoppel is that the party asserting the estoppel must detrimentally and justifiably rely on the representation. *Anderson, 147 F.3d at 477.* Courts have held that commonality is not established where proof of reliance is an element of the claim. See *Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998)*(reliance element not readily susceptible to class-wide proof); *Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 457 (11th Cir. 1996)*(even [*25] where uniform message communicated to retirees, reliance element required highly individualized proof).

Thus, while the court holds that the individual named plaintiffs are free to assert the promissory estoppel theory in support of their § 301 breach of contract claim in Count I, the court notes that this theory is not currently a part of the Count I class action. If the plaintiffs decide to seek class certification on the promissory estoppel theory, the court will address the propriety of such certification at that time.

B. Breach of Fiduciary Duty - Count III

The plaintiffs also assert a claim of breach of fiduciary duty which they assert arose because "the collective bargaining agreement between Plaintiffs and Defendant established a relationship creating a fiduciary duty owed by Defendant to Plaintiffs." Second Amended Complaint, P77. The plaintiffs have cited no authority for the proposition that a fiduciary duty is imposed upon an employer by reason of the mere signing of any collective bargaining agreement, regardless of its terms.

It is conceivable that the breach of fiduciary relationship theory might apply under appropriate circumstances in connection with a [*26] § 301 breach of contract claim. For example, such a claim might arise where the collective bargaining agreement establishes a

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 25 of 34

Page 7

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

special pension fund for the employees and delegates the responsibility for administering this fund to the employer, thereby placing the employer in a special fiduciary or trust capacity, and the employer later violates some provision of the collective bargaining agreement concerning this fund. However, the plaintiffs here do not identify or quote any language in the MFG-3 Agreement which could reasonably be construed as giving rise to a fiduciary relationship.

The term "fiduciary relationship" has been defined as a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt, 40 Ohio St. 2d 107, 115, 321 N.E.2d 603 (1974).* See also *State ex rel. Charlton v. Corrigan, 36 Ohio St. 3d 68, 71, 521 N.E.2d 804 (1988).* A fiduciary relationship is more than the ordinary relationship of employer and employee. *In re Termination of Employment, 40 Ohio St. 2d at 114;* [*27] *Olander v. Ohio Environmental Protection Agency, 134 Ohio App. 3d 723, 732 N.E.2d 400, 402 (1999).*

Here, the plaintiffs have alleged no facts in the second amended complaint which would indicate that a relationship of special confidence or trust was created by any provision of the collective bargaining agreement. There is no allegation, for example, that the SSWT or SHP payments were to be paid from a special fund which the defendants, as trustees of the fund, mismanaged. The mere alleged contractual duty of AT&T under the terms of the MFG-3 Agreement to pay the SSWT and SHP sums as wages would not create a fiduciary relationship. Cf. *Umbaugh Pole Bldg. Co., Inc. v. Scott, 58 Ohio St. 2d 282, 390 N.E.2d 320,* syllabus paragraph one (1979)(relationship of debtor and creditor without more is not a fiduciary relationship). Assuming arquendo that AT&T has such a contractual obligation under the MFG-3 Agreement to pay these sums as additional wages, the pleadings indicate that the failure to pay these benefits amounts to no more than a breach of contract. The defendants are entitled to judgment on Count III.

C. Breach of Strike Agreement - Count [*28] V

The plaintiffs assert a claim for breach of a strike agreement in Count V of the complaint. As noted previously, the Supreme Court held in Retail Clerks Int'l Ass'n that a § 301 action need not be based on a collective bargaining agreement, but instead § 301 is broad enough to encompass suits based on other contracts between an employer and a labor organization representing employees. See also *In re General Motors Corp., 3 F.3d at 983.* However, § 301 authorizes actions for "violation of contracts between an employer and a labor organization representing employees[.]" 29 U.S.C. § 185.

Thus, to assert a separate claim under § 301 for violation of a strike settlement agreement in Count V, the plaintiffs would be required to plead sufficient facts indicating that such a strike settlement agreement was arrived at between the CWA and AT&T.

The plaintiffs allege in P89 of the second amended complaint that the Allen letter, which stated, "These payments will be made to employees for as long as they're employed by the company[,]" constituted a strike settlement agreement. The plaintiffs further assert that "Robert Allen in his letter [*29] promised all of the union members that if they ratified the MFG-3 Agreement, "no one will lose money" and the plugs would be payable until they retired, quit or were terminated and the pension ladders would be paid upon retirement." Second Amended Complaint, P90. The plaintiffs further allege in P91 of the second amended complaint that the "CWA accepted Allen's offer by ratifying the agreement as he requested."

The Allen letter is attached as Exhibit 3 to the second amended complaint. The language of this letter speaks for itself. This letter, addressed to AT&T employees, states that "you've heard a great deal about the contract offer we've made to your union" and that the "company believes it's a fair deal[.]" Allen remarks in his letter that if the employees "look at the details of the offer, I think you'll conclude that it's in the interests of everyone . . . for AT&T and the CWA to come to an agreement so you can return to work." The letter notes that "on May 31 [the union] rejected our offer on the national bargaining table in Washington, D.C." and that contract talks had been suspended. The letter goes on to "highlight the national offer" by summarizing its features. n1 [*30] The letter concludes by stating:

> We think this offer contains a lot of benefits for you and we hope that you agree. It helps put the company in a position to compete in today's environment, a necessary step to assure work for our employees. It does that without taking anything away from you.

> We think it's a good, fair offer -- one that should not have prompted a strike.

> n1 The portions of the letter relevant to this case are as follows:

>> In our manufacturing locations, we plan to consolidate the current nine-grade level of work into two or three grades, depending on

Case 1:00-cv-00458-SJD    Document 88-2    Filed 11/21/2003    Page 26 of 34

Page 8

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

location. Again, no one will lose money under this plan. In fact, more than half of you affected by this plan -- 52 percent -- would earn more money and have greater headroom while the remaining 48 percent would suffer no loss in wages. And, nearly half of all production workers will earn pension increases ranging from 3.3 percent to 12.7 percent as a result of this grade-level consolidation.

We also plan to replace wage incentives in all of our factories. The incentive payments will be replaced with additional increases of 2 or 3 percent in the base wage, depending on location. That increase is in addition to the 8 percent increase called for in our offer. In addition, wage-incentive employees will receive special monthly payments, based on their wage incentive earnings history. These payments will be made to employees for as long as they're employed by the company. Special pension ladders, ranging from 16 to 24 per cent of current pension band values depending on location, will be applicable to all wage-incentive employees.

[*31]

The defendants argue that this letter is insufficient to constitute an offer, but rather at most discussed the features of an offer which had previously been rejected by the union. They note that even the plaintiffs, in their memorandum contra the defendants' motion for judgment on the pleadings on this count, state that the letter "explained the meaning and intent of the AT&T offer as to certain issues in the contract proposal." Plaintiffs' Memorandum Contra, p. 4. The defendants further argue that even if the Allen letter is construed as an offer, there are no pleaded facts indicating that the offer was accepted and incorporated into the subsequent MFG-3 Agreement.

This court agrees that the letter, by its own terms, is merely a discussion of a company offer which was previously rejected by the union at the bargaining table, as well as an expression of opinion by the company president-elect that the company's offer made to the union at the bargaining table was a good one. At most, it discusses terms which might be incorporated into a later

collective bargaining agreement. There is no language in the letter to suggest that it was intended as a separate offer. The letter was for [*32] informational purposes, and was addressed to the employees, not to the union officials who were representing the union members at the collective bargaining table. It does not even specifically urge employees to contact their union representatives to express their support of the company's proposal.

There is no language in the letter itself, nor are any other facts pleaded, which would indicate that the letter was sent for the purpose of communicating an offer to the union. Thus, even assuming that the letter could be construed as an offer, the facts pleaded fail to indicate that this offer was made to the bargaining agents for the union, or that the offer was accepted by the union, or that acceptance of that offer was relayed by the union to the company. See *Telephone Management Corp. v. Goodyear Tire & Rubber Co., 32 F. Supp. 2d 960, 970 (N.D.Ohio 1998)*("There can be no binding contract unless it first appears that acceptance of the offer proposed was received by the offerer.")

Further, in order to constitute a contract, the acceptance must meet and correspond with the offer in every respect. *Karas v. Brogan, 55 Ohio St. 2d 128, 129, 378 N.E.2d 470 (1978).* [*33] Here, the Allen letter states that "payments will be made to employees for as long as they're employed by the company", whereas the actual language in the collective bargaining agreement states that the payments will continue "as long as the employee remains in a PRODUCTION OCCUPATION LEVEL." No facts are pleaded to explain why the MFG-3 language differs from the language of the Allen letter.

No facts have been pleaded indicating that the union ever formally accepted the terms of the Allen letter or signed a separate agreement containing those specific terms in exchange for ending the strike sufficient to constitute an enforceable § 301 contract. Even assuming the Allen letter constituted an offer to the union, that offer was subsumed in the collective bargaining process. The facts pleaded in the complaint indicate that it is the MFG-3 Agreement which constitutes the final agreement between the company and the union as the official bargaining agent for the employees, and the terms of the MFG-3 Agreement would supersede any other agreement previously reached concerning those same terms. See, e.g., Second Amended Complaint, Introduction ("Plaintiffs' claim is that pursuant to a [*34] Master Collective Bargaining Agreement, known as the MFG-3 Agreement, negotiated between CWA and AT&T in 1986, subsequent to a strike, they are entitled to SSWT and/or SHP wage supplements for the remainder of their employment with AT&T in a production occupation level and pension bands upon retirement.") See also *Schuver, 154 F.3d at 799* (plaintiffs must show that terms of oral contract not

2000 U.S. Dist. LEXIS 21814, *; 168 L.R.R.M. 2456

superseded or contradicted by the terms of the collective bargaining agreement).

The court concludes that, based on the pleadings, the plaintiffs cannot establish the existence of a strike settlement agreement based on the Allen letter which would be independently enforceable as a § 301 labor contract, and defendants are entitled to judgment on the pleadings on Count V.

IV. Conclusion

The defendants' motion for judgment on the pleadings in granted, with the exception that the individual named plaintiffs will be permitted to assert an estoppel argument in connection with their § 301 breach of contract claim in Count I.

It is so ordered.

Date: August 31, 2000 [*35]

James L. Graham

United States District Judge

PLAINTIFF'S
EXHIBIT

_____D_____

tabbies

LEXSEE 2000 U.S. DIST. LEXIS 20879

**MARIO GASPERONI and EUGENIA CORRY TRUMBULL, Plaintiffs, v. METABOLIFE, INTERNATIONAL INC., Defendant.**

**Case No. 00-71255**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2000 U.S. Dist. LEXIS 20879*

**September 27, 2000, Decided
September 27, 2000, Filed**

**DISPOSITION:** [*1] Plaintiffs' motion for class certification GRANTED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For MARIO GASPERONI, EUGENIA CORRY TRUMBULL, plaintiffs: Mark S. Baumkel, Provizer & Phillips, Bloomfield Hills, MI.

For MARIO GASPERONI, EUGENIA CORRY TRUMBULL, plaintiffs: Gerard V. Mantese, E. Powell Miller, Marc L. Newman, Mantese, Miller, Troy, MI.

For METABOLIFE INTERNATIONAL, INCORPORATED, defendant: Bradley J. Schram, Bradford T. Yaker, Hertz, Schram, Bloomfield Hills, MI.

For AMY TADLOCK, MARY COOPER, SELKET POREA, movants: Dennis M. O'Bryan, O'Bryan, Baun, Birmingham, MI.

For JOHN BAHL, movant: Irwin M. Alterman, Kemp, Klein, Troy, MI.

**JUDGES:** AVERN COHN, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** AVERN COHN

**OPINION:**

**ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I. Introduction

This is a products liability case. n1 Plaintiffs Mario Gasperoni and Eugenia Corry Trumbull (collectively plaintiffs) are suing Metabolife international, Inc. (Metabolife), on behalf of themselves and as a class under Fed. R. Civ. P. 23, for misrepresentation for failing to warn Michigan consumers that ephedrine, an ingredient in Metabolife's diet product Metabolife 356, is capable of producing adverse health problems. Before [*2] the Court is plaintiffs' motion for class certification. For the reasons that follow, the motion will be granted.

> n1 On May 4, 2000, the Court denied defendant's motion to dismiss. See Memorandum And Order of May 4, 2000.

II. Background

A.

Metabolife manufactures and distributes the appetite suppressant Metabolife 356, which contains a combination of 18 different ingredients including ephedrine. The product label identifies Metabolife 356 as an "herbal formula to enhance your diet and provide energy," and states that the product is "independently laboratory tested for safety*." ("*Based upon multi-species clinical laboratory testing").

Plaintiffs claim that ephedrine is a potent central nerve stimulant, which can cause adverse health risks such as nervousness, dizziness, tremors, alteration in blood pressure or heart rate, headache, gastrointestinal

distress, chest pain, myocardial infarctions, stroke, seizures, psychosis, brain damage, and death. Metabolife's web site, found at <http://www.metabolife. [*3] com/shop/index.html>, warns Texas consumers that, "This product has ephedrine groups alkaloids in the form of herbal extracts and may cause serious adverse health effects." However, no such warning is directed to Michigan consumers.

Plaintiffs, who purchased and ingested Metabolife 356, claim that Metabolife's labeling is deceptive and misleading because it fails to warn Michigan consumers of the adverse health effects of ephedrine, it fails to adequately disclose to consumers that use of the product has not been clinically tested or FDA approved, and it fails to warn consumers that possession of a certain amount of ephedrine (the equivalent of 10 bottles of Metabolife 356) is against Michigan law and actually encourages consumers to possess such amounts by giving them a discount for purchases of 10 bottles or more. Through these omissions, and its affirmative statement that Metabolife 356 is "tested for safety," Plaintiffs maintain that Metabolife's labeling constitutes a fraudulent misrepresentation and a breach of warranty.

B.

Plaintiffs seek to represent a class composed of "all persons in the State of Michigan who purchased and/or consumed the appetite suppressant Metabolife [*4] 356 and other diet products containing ephedrine manufactured, distributed, marketed and sold by Defendant (the "Class") during the period commencing from February 4, 1994 up to the date of trial (the "Period")." Revised Amended Complaint P 33. n2 For each member of the class, plaintiffs seek damages/restitution in the amount of the purchase price of the product. Plaintiffs also seek injunctive relief in the form of an order requiring Metabolife to: (1) post an appropriate form of notice where the diet products have already been sold and are currently being sold, informing consumers of the dangers of consumption of the product, (2) revise its labeling to warn all future consumers of the serious risks associated with the consumption of the product; and (3) pay for medical examinations and health monitoring for all members of the class.

n2 Initially, plaintiffs sought nationwide class certification, but later conceded in their reply brief that certification for a class consisting only of Michigan consumers would be more manageable at this time. Thus, the Court does not address the extensive arguments posed by Metabolife concerning issues involving a nationwide class.

Plaintiffs presently seek class certification solely on the issue of "whether the label on [Metabolife 356] is materially misleading when viewed as a whole." Proposed Order Granting Class Certification.

III. Analysis

A. Standard for Class Certification

Under Fed. R. Civ. P. 23(a), a case may be brought as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the class.

In addition to these requirements, the proposed class representatives must also demonstrate that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

In evaluating a case for certification, the Court has broad discretion. *In re Jackson National Life Ins. Co. Premium Litigation, 183 F.R.D. 217 (W.D. Mich. 1998).* The Court must conduct a "rigorous analysis" to determine if the Rule 23 [*6] requirements are met and it may, but is not required to, go beyond the pleadings. *In re American Medical Systems, Inc., 75 F.3d 1069, 1078-79 (6th Cir. 1996).*

Here, Metabolife opposes class certification mainly on the grounds that individual issues of fact and law predominate. Specifically, Metabolife contends that its product is not sold in a uniform manner, issues of reliance, causation, and injury must be proved individually, and plaintiffs' claim for medical monitoring transforms this case into a personal injury case, so as to preclude a class action. Metabolife also says that the named plaintiffs are neither typical nor adequate representatives of the class.

B. Bringing a Class Action Case (Fed. R. Civ. P. 23(a))

1. Numerosity

The numerosity requirement is not in dispute here. Metabolife 356 has admittedly been sold to thousands of consumers in Michigan over the past several years. The class, therefore, is sufficiently numerous to make joinder impracticable. See *Smith v. General Motors Corp., 1977 U.S. Dist. LEXIS 17094, 14 Fair Empl. Prac. Cas. (BNA)*

*987 (E.D. Mich. 1977)* (stating that thirty-five is often the standard).

2. Commonality

Class members must have either a question of law or fact [*7] in common, not necessarily both. See Fed. R. Civ. P. 23(a); *Ballan v. Upjohn Co., 159 F.R.D. 473 (W.D. Mich. 1994)*. Here, plaintiffs contend that there are several common questions of law and fact, including, inter alia:

> (1) whether Metabolife's labeling is misleading for failing to disclose health risks,
>
> (2) whether Metabolife knew of the risk of injury from Metabolife 356, and
>
> (3) whether Metabolife failed to adequately warn of the adverse effects in consuming Metabolife 356. n3

> n3 Plaintiffs originally claimed also that Metabolife breached the warranty of safety appearing on the bottle. However, at oral argument, plaintiffs represented that they wished to proceed on the misrepresentation claim only. Therefore, the Court does not address the parties arguments on breach of warranty.

Metabolife does not seem to dispute that there exists common questions of law and fact, but rather, as will be discussed infra, argues that the individual issues predominate over [*8] the common questions. Indeed, every bottle of Metabolife 356, sold during the relevant period, carries (and omits) the same language and information that plaintiffs contend is false and misleading. Thus, there are common questions of law or fact present, as required by Fed. R. Civ. P. 23(a).

3. Typicality

The purpose of the typicality requirement is to assure that the named representatives' interests align with those of the class. *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)*. The inquiry focuses special attention on "differences between class representative claims and class claims that would defeat the representative nature of the class action." *Van Vels v. Premier Athletic Center of Plainfield, Inc., 182 F.R.D. 500, 510 (W.D. Mich. 1998)*. Generally, the typicality requirement is met if the representative shares a common element of fact or law with the class. *Senter v. General Motors Corp., 532 F.2d 511, 525 (6th Cir. 1976)*. Here, plaintiffs assert that the typicality requirement is met because their claims, like the

entire class's claims, are based on Metabolife's marketing, sales, and labeling of its product. [*9] See *Van Vels, supra*. Since both Gasperoni and Trumbull purchased bottles containing the same misleading labels, they say their claims are typical of the class.

Metabolife, however, argues that the typicality requirement is not met because Metabolife has individual defenses to the named plaintiffs' claims which destroys typicality. Specifically, Metabolife contends that Gasperoni's intentional failure to consult a physician, and Trumbull's receipt of bad medical advice after she did consult a physician, were the causes of their injuries - not Metabolife's product. n4 Metabolife relies upon *Ballan v. Upjohn Co., supra*, a fraud-on-the-market securities case in which the plaintiff was found to be atypical of the class he sought to represent because he purchased the stock after curative disclosures had been made. The court in Ballan found that the plaintiff's "interest in the case will be different with regard to the materiality of the curative disclosure than the interest of class members who purchased prior to the curative disclosures." *159 F.R.D. at 480*.

> n4 This is also the essence of Metabolife's motion for summary judgment.

[*10]

In contrast to Ballan, there is no evidence here indicating that either named plaintiffs received curative disclosures prior to their purchase' or consumption of the product. Indeed, this is the whole point of this case -- plaintiffs charge that Metabolife's label does not sufficiently disclose the risks associated with its product and fail to place plaintiffs on notice as to the potential harm that they are incurring. Since both plaintiffs purchased and/or used Metabolife 356 without an adequate warning on the label, their claims are typical of the class they are seeking to represent.

Also, the fact that Trumbull has already received a refund for her purchase of Metabolife 356 is not dispositive because plaintiffs are seeking an injunction as well as money damages in the form of a refund of the purchase price.

4. Adequacy

The adequacy of class representation is measured by (1) the qualifications of the named plaintiffs' attorneys and (2) the extend to which the plaintiff's interests may be antagonistic to those of the class. *Senter, supra 532 F.2d at 524-25*. Here, there is no challenge to the qualification of plaintiffs' attorneys, E. Powell Miller and Gerald Mantese, [*11] nor to their firm, Mantese Miller and Mantese, P.L.L.C.

Metabolife instead argues that the named plaintiffs' interests are antagonistic to the class in that (1) they are proposing to waive available claims and elements of damages for absent class members, and (2) treating this case as a class action may preclude class members from later bringing personal injury claims for pain and suffering. See *Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982)* (holding class representatives inadequate where they were "presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action.") Thus, Metabolife argues that Gasperoni and Trumbull are inadequate because they are creating a res judicata risk for the class members. n5

      n5 In Michigan, the doctrine of res judicata is applied to bar claims that were not only actually litigated, but also unasserted claims arising out of the same transaction that might have been raised in the previous suit. See *VanDeventer v. Michigan Nat'l Bank, 172 Mich. App. 456, 464, 432 N.W.2d 338 (1988).*

**[*12]**

Plaintiffs deny any such conflict, and question the validity of Feinstein in light of *Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 81 L. Ed. 2d 718, 104 S. Ct. 2794 (1984)* (holding that judgment in a class action where employer was found not to have engaged in a general pattern or practice of race discrimination against employees did not preclude class members from later maintaining individual race discrimination claims against the employer). See also NEWBERG ON CLASS ACTIONS § 1.7 (3d. ed. 1992) at p. 17-20 ("Cooper modified the rule barring a splitting of the cause of action in separate litigation in particular circumstances.") Alternatively, plaintiffs suggest that the class be defined to specifically exclude persons bringing individual personal injury claims.

Notwithstanding the academic discourse of the impact of Cooper regarding class action and res judicata, adopting the plaintiffs' alternative Suggestion to define the class so as to exclude persons who bring individual personal injury claims will alleviate most of Metabolife's res judicata "concerns." See *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 895 (7th Cir. 1981)* **[*13]** ("It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether 'the representative parties will fairly and adequately protect the interest of the class,'... it is a bit like permitting a fox,

although with pious countenance, to take charge of the chicken house.") If those people with individual personal injury claims can opt out of the class, or are specifically excluded from the definition of the class, there is no danger of the class waiving any individual claims of its members. Moreover, the only legal issue to be certified is simply whether the label is materially misleading. Any personal injuries that develop in class members after the present suit, will not be subject to res judicata because their claim will not have been actually litigated, nor will it be one that "might have been raised" in the previous suit. This compromise solution seems to be the most equitable, allowing common issues to be litigated without waiving any individual claims. See In re Diet Drugs ( *Phentermine, Fenfluramine, Dexfenfluramine Products Liability Litigation, 2000 U.S. Dist. LEXIS 12275, Nos. 1203, 99-20593, 2000 WL 1222042* **[*14]** (E.D. Pa. Aug. 28, 2000). Accordingly, the named representatives are adequate.

C. Maintaining a Class Action (Fed. R. Civ. P. 23(b)(3))

1. Predominance

The bulk of Metabolife's opposition to class certification rests upon its contention that individual issues of fact and law predominate in this case. Specifically, it argues that: (1) liability for misrepresentation necessarily turns on the details of any pre-sale communication and sales of Metabolife 356 are materially different from one customer to the next, (2) reliance, causation, and injury must be proven individually and cannot be presumed, and (3) medical monitoring presents issues requiring individualized proof. Each will be addressed in turn.

a. Differences in Pre-sale Communication

Metabolife has submitted extensive documentation, in the form of declarations and exhibits, showing the various methods, beyond simply the bottle's label, by which information about Metabolife 356 is conveyed to customers. For example, in addition to receiving information through Metabolife's marketing and advertisements efforts via the radio, the Internet, newspapers, and television, customers can ask health-related and product usage questions **[*15]** by e-mail and by calling a toll-free telephone health-line. There are also direct sales representatives which provide different information to different customers, depending upon the circumstances each customer presents. Due to the variety of information provided to customers, Metabolife argues that plaintiffs' claim that customers were "lulled into a false sense of safety" by the label, is actually an individual question requiring a careful review of the total information that a particular customer received before any determination can be made on liability for

misrepresentation. Presumably, the thrust of Metabolife's argument is that any potential misrepresentation that might arise from the label can be cured by additional information from external sources and, therefore, any claim of misrepresentation must 'be analyzed individually in light of all the information received by that particular person.

In support, Metabolife relies on the Sixth Circuit case, *In re American Medical Systems, supra,* (class action against penile implant manufacturer), which, in reversing the district court's grant of class certification on the grounds that individualized issues predominated, **[*16]** reasoned that:

> Each plaintiff has a unique complaint and each receives different information and assurances from his treating physician... In this situation, the economies of scale achieved by class treatment are more than offset by the individualization of numerous issues relevant only to a particular plaintiff... Thus, even assuming common questions of law or fact, it cannot be said that those issues predominate...

*Id. 1085,* Metabolife likewise argues that individual issues predominate here as well, such as "why a consumer bought the product, what information the consumer considered, and whether the consumer used the product as directed and in accord with cautions given prior to initial use all must be considered." Metabolife's Response Brief at 15.

Metabolife's arguments, however, ring hollow. The only legal issue to be decided here is whether the label, taken as a whole, is materially misleading. Regardless of what other information a consumer may consider or rely on, every purchaser is exposed to the information on the label. If such information is shown to be false and misleading, it is not enough to say that truthful information is available **[*17]** somewhere else. Also, the essence of plaintiffs' case is that the bottle label is deficient and incomplete. Simply because a customer can find additional information from an external source does not sanitize the label. Moreover, plaintiffs' use (or misuse) of the product is irrelevant to the current claims, which are for consumer fraud and misrepresentation and not for personal injuries sustained as a result of use of the product.

Here, all the plaintiffs allege a common method of misrepresentation, and all allege the same legal claim. See *Dix v. American Bankers Life Assurance Co., 429 Mich. 410, 416, 415 N.W.2d 206 (1987); see also* In re Diet Drugs, supra, at *42-43 (holding that common issues involving "a common product, defendant and course of conduct" predominated over any individual issues between class members). Thus, the present case is distinguishable from the situation in American Medical Systems where the plaintiffs could not establish any common defect among the ten different models of implants. It is also distinguishable in that here, plaintiffs are not claiming that use of Metabolife 356 itself harmed them, but rather that the label is defective **[*18]** and incomplete, resulting in a material misrepresentation at the time of purchase.

b. Reliance, Causation, and Injury

Metabolife also argues that the elements of reliance, causation, and injury cannot be presumed here, and as such, individualized inquiries into each customer's reliance, causation, and injury are necessary. Metabolife contends that the presumption of reliance and causation given in securities cases is inapposite in this case. They argue that "it would be illogical. . . to presume reliance where the effect, if any, of various materials, including the label, on each class member's purchase are uncertain -- and where the record evidence on the two Plaintiffs shows that one did, and one did not, act in accordance with the label directions." Metabolife Response Brief at 18-19.

Each of plaintiffs' claims must be analyzed separately.

(i) Common Law Fraud

To state a claim for misrepresentation or omission, plaintiffs must allege the following: (1) defendant made a material representation; (2) the representation was false; (3) defendant either knew the representation was false, or acted with reckless disregard for truth or falsity; (4) defendant intended plaintiff to rely; **[*19]** (5) plaintiff acted in reliance; (6) plaintiff suffered harm/injury. *Hi-way Motor Co. v. International Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976).* Here, actual reliance is a required element of the claim of common law fraud. Plaintiffs have proffered no case which holds that reliance can be presumed in the context of a common law fraud case. As such, an individualized inquiry would be necessary for each class member and the claim for common law fraud is not fit for class action.

However, under Michigan law, a fraudulent omission (silent fraud) n6 occurs when there is: "(1) a material omission, (2) an affirmative duty by the defendant to disclose the fact, (3) a failure by defendant to speak when the duty to do so requires it, and (4) an intent to induce reliance on nondisclosure." *Clement-Rowe v. Michigan Health Care Corp., 212 Mich. App. 503, 538 N.W.2d 20 (1995).* Unlike a claim for an affirmative representation, a claim for fraudulent omission does not require any proof of actual reliance. Id. Rather, it merely requires an intent, on the part of the defendant, to induce reliance on

nondisclosure. Id. This would require only [*20] an inquiry into the intent of Metabolife, not each class member. As such, it is amenable to class treatment.

n6 Neither party addresses silent fraud in their papers. However it was mentioned in Metabolife's previous motion to dismiss.

(ii) Michigan Consumer Protection Act

Plaintiffs also claim misrepresentation under the Michigan Consumer Protection Act, M.C.L. § 445.901 et seq. Under this statute, reliance and causation are satisfied by proof that plaintiffs purchased and consumed the product. See *Dix v. American Bankers Life Assurance Co. of Florida, 429 Mich. 410, 415 N.W.2d 206 (1987)*. In *Dix*, the Michigan Supreme Court specifically held that:

members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentation. It is sufficient if the class can establish that a reasonable person would have relied on the representation. Further, a defendant's intent to deceive through a pattern of misrepresentations can be [*21] shown on a representative basis under the Consumer Protection Act.

*Id. at 418.*

Metabolife's attempts to distinguish *Dix* are unpersuasive. Contrary to Metabolife's assertions, *Dix* is not limited to securities cases -- it has subsequently been held to apply in non-securities cases as well. See e.g., *Van Vels v. Premier Athletic Center of Plainfield, Inc., 182 F.R.D. 500, 508 (W.D. Mich. 1998)* (consumer class action against chain of health clubs; "Unlike common law fraud, misrepresentation claims under the MCPA do not require proof of individual reliance.")(citing *Dix*).

Additionally, it is important to remember that the purpose of the Michigan Consumer Protection Act is to "provide an enlarged remedy for consumers who are mulcted by deceptive business practices" and that it "should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons." *Dix, supra, 429 Mich. at 417-18*. Accordingly, plaintiffs are entitled to class certification on their claim of misrepresentation under the Michigan Consumer Protection Act.

c. Medical Monitoring

Metabolife additionally [*22] argues that despite plaintiffs' assertions to the contrary, plaintiffs' claims for medical monitoring, which require Metabolife to pay for past and future treatment of injured class members as well as damages for "past and future risk of serious latent disease," invoke individual personal injury-type damages and consequently render this a personal injury case. Plaintiffs respond that Metabolife's argument is baseless - they are only seeking medical monitoring to allow consumers who ingested Metabolife 356 to find out whether they have physical damage attributable to the product. Plaintiffs say that although this medical monitoring may lead to personal injury suits after such examinations, it does not create individualized issues in the present case. The Court agrees, especially in light of the modification of the class to specifically exclude those persons with a personal injury claim. Thus, common issues predominate and allow for class certification.

2. Superiority

Metabolife finally argues that plaintiffs' trial plan is seriously flawed because it fails to show how the individual issues of reliance, causation, and damages can be handled in a way that would not create overwhelming [*23] manageability problems. See *In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 219-21 (E.D. La 1998)* (rejecting plaintiffs' propose trial plan where plan did not alleviate manageability problems concerning causation, reliance, and affirmative defenses.) Indeed, the court in In re Ford Paint Litig, expressly stated that courts are "explicitly prohibited from... certifying a class now and worrying about how to try it later. *Id. at 225*. Plaintiffs respond that Metabolife's "obstacles" are disingenuous and easily correctable. See NEWBERG, supra § 9.12 ("Class suits should rarely be denied or decertified solely because class management problems are complex.")

Given that plaintiffs seek only class certification on the discrete common issue of whether the label taken as a whole is materially misleading, the case would be entirely manageable as a class action. In addition to significantly advancing the litigation, maintaining this case as a class action is also desirable so as to prevent inconsistent rulings. See Fed. R. Civ. P. 23(b)(1). As a class action, the adequacy of Metabolife's labels will be decided by only one fact-finder. [*24] If plaintiffs lose on the common issue of whether the label is misleading or not, than any subsequent case relying upon the label would be barred.

Finally, and most importantly, it should be emphasized that in general, any doubts concerning the propriety of a class certification should be resolved in favor of upholding the class. See *Esplin v. Hirschi, 402 F.2d 94, 101 (2d Cir. 1968)* ("The interests of justice require that in a doubtful case. . . any error, if there is to be one, should be committed in favor of allowing the class action.") This is especially so in a case such as here, where

the individual damage claims are so small that denial of class certification would effectively eliminate the litigation. In such circumstances, courts should be liberal in granting class certification. See *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997)* (noting that "'the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'") (quoting *Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.1997)).* **[*25]**

Although Metabolife is technically correct that the named plaintiffs can still obtain their main objectives, i.e., a refund of the purchase price, a change in the labels and attorney fees, through an individual suit under the Michigan Consumer Protection Act, MCLA § 445.911(1)(a) and § 445.911(2), it misses the point -- which is that it is highly unlikely that the members of the class would ever file suit individually to recover only the small purchase price of the product. Thus, denying certification would seriously inhibit an avenue of legal redress for the members of the class, assuming that plaintiffs' claims have merit. See *Paley v. Coca-Cola Co., 389 Mich. 583, 595, 209 N.W.2d 232 (1973)* ("The class action. . . has been particularly helpful for one of today's most beleaguered and disaffected groups -- the consumer. It is a kind of better slingshot for the modern David to

tackle Goliath with." Accordingly, a class action is the superior method of adjudication.

D.

In summary, the labels on the bottles of Metabolife 356 create common questions of law and fact under the Michigan Consumer Protection Act. The description of the class is limited to exclude class **[*26]** members who have individual personal injury claims and the legal issue is limited to whether the labels are materially misleading. The Court will not certify the common law fraud claim because it depends upon the resolution of individual questions of law and fact.

IV. Conclusion

For the reasons stated above, plaintiffs' motion for class certification is GRANTED. An order will be entered upon notice of presentation and opportunity to respond.

SO ORDERED.

AVERN COHN

UNITED STATES DISTRICT JUDGE

Dated: SEP 27 2000

Detroit, Michigan