
PLAINTIFF'S EXHIBIT F

3 of 3 DOCUMENTS

The Estate of Lamont Cattano, et al., Appellee/Cross-Appellant v. High Touch Homes, Inc., Appellant/Cross-Appellee

Court of Appeals No. E-01-022

COURT OF APPEALS OF OHIO, SIXTH APPELLATE DISTRICT, ERIE COUNTY

2002 Ohio 2631; 2002 Ohio App. LEXIS 2754

May 24, 2002, Decided

**PRIOR HISTORY:** [**1] Trial Court No. 97-CV-199.

**DISPOSITION:** Trial court's judgment was affirmed, in part, and reversed, in part.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** Mark A. Stuckey and Linda R. Van Tine, for appellee.

Karl H. Schneider and Michelle Polly-Murphy, for appellant.

**JUDGES:** Peter M. Handwork, J., Melvin L. Resnick, J., James R. Sherck, J., CONCUR.

**OPINIONBY:** Peter M. Handwork

**OPINION: DECISION AND JUDGMENT ENTRY**

HANDWORK, J.

[*P1] This appeal is from the October 22, 1999 final judgment of the Erie County Court of Common Pleas which approved the jury verdict in favor of appellee, the estate of Lamont Cattano, and awarded the estate treble damages on its claims of breach of contract and violation of the Ohio Consumer Sales Practices Act. Upon consideration of the assignments of error, we affirm in part and reverse in part the decision of the lower court. Appellant/cross-appellee, High Touch Homes, Inc., asserts the following assignments of error on appeal:

[*P2] "Assignment of Error No. 1

[*P3] "THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

[*P4] "Assignment of Error No. 2

[*P5] "THE TRIAL COURT ERRED IN TREBLING THE DAMAGES AWARDED BY THE JURY.

[*P6] "Assignment [**2] of Error No. 3

[*P7] "THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION TO DISMISS COUNT TWO OF THE APPELLEE'S COMPLAINT."

[*P8] Appellee/cross-appellant, Estate of Lamont Cattano, asserts the following cross-assignments of error:

[*P9] "I. THE TRIAL COURT ERRED AS A MATTER OF LAW BY DENYING CROSS-APPELLANT'S MOTION FOR DEFAULT JUDGMENT FILED NOVEMBER 17, 1997, WHERE CROSS-APPELLEE WAS GRANTED A THIRTY (30) DAY LEAVE TO FILE ITS ANSWER ON FEBRUARY 14, 1997 BUT DID NOT FILE ITS ANSWER UNTIL NOVEMBER 17, 1998, AND WHERE CROSS-APPELLEE FAILED TO FILE ITS MOTION FOR LEAVE TO FILE ITS MOTION FOR LEAVE [sic] TO FILE AN ANSWER INSTANTER UNTIL DECEMBER 28, 1998, WHICH WAS GRANTED APRIL 9, 1999.

[*P10] "II. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ALLOWED CROSS-APPELLEE TO FILE ITS ANSWER OUTSIDE THE TIME FRAME MANDATED BY CIVIL RULE 12.

[*P11] "III. THE TRIAL COURT ERRED AS A MATTER OF LAW IN COMPUTING TREBLE DAMAGES DUE PLAINTIFF IN ITS SEPTEMBER 15, 1999 JUDGMENT ENTRY"

[*P12] In 1995, Lamont Cattano executed a written contract with High Touch Homes to purchase a modular home. The home was delivered by Redman Homes, Inc. The parties dispute [**3] who was responsible for the setup of the home. After he moved into the home, Cattano complained about deficiencies in the home. Cattano died in November 1996. The executrix of his estate brought this action against High Touch Homes, Richard Wobser, Redman Homes, Inc., and Mark Stacy in January 1997.

[*P13] Cattano's estate asserts that the home did not meet the standard of quality required under the contract because: 1) it did not include galvanized floor-joist hangers as required under the contract; 2) it was not of the same quality and did not have the same amenities as the model shown to Cattano; and 3) it was not constructed in a professional and workmanlike manner. Cattano's estate asserted claims of fraud, breach of contract, breach of workmanlike performance, and violation of several sections of the Consumer Sales Practices Act. The fraud claim was later dismissed by the court. The court also dismissed defendants Stacy and Wobser.

[*P14] At trial, the following evidence was presented. Angelo Mularoni, who had been in the construction industry for forty-eight years and a general contractor of custom-built houses for thirty years, testified that he examined the home [**4] at issue and found various defects. He found that the service door to the garage was not plumb and level causing gaps in the fittings; a six-foot span of the floor sagged from the exterior wall to the supporting wall; the drywall corners were not installed correctly; there were cracks along the ceiling; the cabinets had not been set properly; there were stress cracks in the drywall due to the sagging floor; the drywall had been poorly taped; the formica counters had been improperly glued; and either the floor joists were too short or the marriage beam was not installed properly because the nailing of the joists did not hold. He attributed the wall and floor problems to improper nailing and to the fact that the floor joist and beam configuration were not up to industry standard. However, Mularoni testified that he was not familar with modular homes and did not know the industry standards to evaluate them. He did expect, however, that a modular home should not be of lesser quality than a custom built home.

[*P15] Richard Stanley Jr., a self-employed carpenter since 1972, testified that he also viewed the house on March 8, 1996 and found cracks in the drywall. He believed most were [**5] due to settling of the framing and material shrinkage. He believed that the fact that the walls were pulling away from the ceiling was due to improper affixing of the floor joists to the marriage beam and the ledger beam. Therefore, when the joists settled downward, the walls followed and a crack formed at the ceiling. He also believed that this would be unacceptable in the industry.

[*P16] Stanley Ringle also examined the home and found that the center beam was sagging and causing the walls to pull away from the ceiling and that the formica counters were not fitted to the cabinets. He also testified on cross-examination that he had never installed a preassembled home.

[*P17] Richard Wobser, a 30-year mason, testified that he had been hired and paid by appellant to do work on the Cattano home. Wobser worked under Dean Jones from appellant's offices. Wobser recalled that he did not put in a footer on either the front porch steps or the back slab porch as he had originally planned because Jones told him it was not necessary. Wobser believed that the floor posts are not properly seated to the concrete slab which may have been caused by the lack of a footer. He also testified [**6] that there was no building code that required the footer.

[*P18] Daniel J. Schiefley, a certified residential real estate broker in the area and a friend of the Cattano family, testified that he appraised the property on Dec 11, 1998 and March 2, 1999. The first time, he valued the property at $ 130,000 with conditions that needed to be repaired--drywall, counter tops, plumbing that was substandard, structural damage, and the hot water tank replaced because it had a hole erroneously drilled in it that was never repaired. Schiefley estimated that the home was worth $ 65,000 without fixing all the problems. However, Schiefley had no documentation to prove that it would cost $ 65,000 to repair the home. He based his estimate on his own personal experience with construction and repairs. After the second appraisal, Schiefley found that nothing had changed with the house. He believed that a contractor might buy the house at a discount and fix it up for resale.

[*P19] Michael Hula, a general contractor since 1987, testified that he has worked on installing modular homes before and that he examined the Cattano home. He found that the marriage beam was not level; the floor joists [**7] were improperly joined to the beam; and there were no copper plumbing lines. He estimated that repairs to the home would take a month and a half, preferably with the house empty because the whole house would have to be jacked up. He calculated that it would cost $ 36,950 to repair the home; but, the figure may be higher once work began and other hidden problems were revealed. However, he believed the house was worth repairing.

[*P20] Jeffrey Guth, the Secretary/Treasurer of appellee, testified that he sells Redmond Homes and has been in the business 17 years. Guth testified that Dean Jones sold appellant this home and that he is no longer an employee of appellee. Cattano purchased the home on August 1, 1995 and paid $ 59,200 for the home and an additional $ 19,800 for subcontractors to install the home. Guth testified that Cattano chose the subcontractors, but that they were paid through appellee. Appellee acted as the general contractor because the bank did not like the homeowner to be the general contractor. Guth viewed the home after setup when Cattano complained of the formica, drywall, and the siding. Guth also saw improperly nailed joists in the crawl space. However, he [**8] testified that it was not uncommon to find nails or glue that misses the mark in modular homes. Guth also found that the trusses did not run all the way to the beam causing the floor to sag. He further testified that this was not good, but acceptable in the industry.

[*P21] Guth testified that some repairs were made before Cattano moved in. Afterward, Cattano contacted Redmond Homes directly and left appellant out of the discussions. Appellant was never permitted to go back in the home. They offered to go in and fix the house from underneath and to put Cattano up in a hotel while the work was done, with $ 50 a day for meals. The work was expected to take no more than three days. Appellant refused to pay $ 5,000 to remove all of Cattano's belongings and store them. However, appellant did agree to professionally clean the house. Guth testified that appellant is still willing to make the repairs even though the warranty expired one year after manufacture.

[*P22] Chris Cattano Baker, Cattano's daughter, testified that she went with her father when he met with Jones. While her father knew that some of the features were not top quality, he thought they were sufficient for his [**9] use for the rest of his life. He selected only a few upgrades. She testified that the home was delivered at the end of September and was finished two days before Thanksgiving. A few weeks after appellant moved in, she was there when appellant's employee, Neil Vogel, who oversaw the installation of the house did a walk-through. They found that the plumbing was connected backwards (hot and cold), there were drywall problems, drywall cracks that had been caulked, and the bathtub had a hole in it that someone had poorly patched. Cattano hired a lawyer because he realized that he had major problems with the home.

[*P23] In January 1996, a representative of Redmond Homes came to inspect the home. Cattano did not want them to fix the home because he knew that they could not do a good job in three days and was afraid they would just cover up the errors again. He knew that he could not live there with drywall dust and he did not want his belongings covered with dust. Chris Cattano Baker believed that the home she was shown was not of the same quality as what was delivered.

[*P24] Tim Tyler, a purchasing agent for another modular home company, testified that he was the service manager [**10] for Redmond Homes at the time Cattano purchased his home. Tyler inspected the home and discovered that the house was not properly supported when it was laid on the foundation, which would have been the responsibility of Redmond. There were only six piers when there should have been eight. He found nothing else at the time that indicated that the home did not meet industry standards. He believed that the nails sticking out from the floor joist and missing the marriage beam would not be typical, but would be acceptable in the industry. Tyler believed that the home could be repaired by installing more piers, realigning the ones that were there, realigning the walls, etc., and then patching the drywall.

[*P25] Kelly Cook, the director of production for Redmond, testified that the home purchased by Cattano met Ohio building code. She had seen the videotape showing the defects in the home and believed that nothing she saw was below industry standards.

[*P26] Daniel Sneddon, the director of customer service for Redmond Homes, testified that he estimated the cost of repairing the home to be $ 5,000 and very few days would be required to do the work because they send a large crew. [**11]

[*P27] Following a jury trial, Cattano's estate was awarded $ 25,000 on the breach of contract claim and $ 20,000 for violating the Consumer Sales Practices Act. High Touch Homes, Inc. filed a motion for judgment notwithstanding the verdict, which was denied on June 4, 2001.

I

[*P28] In its first assignment of error, High Touch Homes, Inc. argues that the trial court erred by denying both its motion for directed verdict and for judgment notwithstanding the verdict. High Touch Homes, Inc. contends that in both motions, it argued that Cattano's estate lacked standing to sue for money damages under the Ohio Consumer Sales Practices Act and that there was insufficient evidence to support the claim.

[*P29] A motion for directed verdict and a motion for judgment notwithstanding the verdict are used to challenge whether the non-moving party has presented sufficient evidence to allow the jury to decide the issues raised. Civ.R. 50(A)&(B); *O'Day v. Webb (1972), 29 Ohio St. 2d 215, 58 Ohio Op. 2d 424, 280 N.E.2d 896,* paragraph three of the syllabus, *Texler v. D.O. Summers Cleaners & Shirt Laundry Co. (1998), 81 Ohio St. 3d 677,*

*679, 693 N.E.2d 271*; and *Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St. 2d 271, 275, 74 Ohio Op. 2d 427, 344 N.E.2d 334*. [**12] The difference between the two motions is that the motion for judgment notwithstanding the verdict involves consideration of all the evidence submitted in the case rather than only the plaintiff's evidence. *Chemical Bank of New York v. Neman (1990), 52 Ohio St. 3d 204, 206-207, 556 N.E.2d 490*.

[*P30] When ruling on either motion, the court must construe the evidence most strongly in favor of the party against whom the motion is directed and determine whether reasonable minds could only conclude that the movant is entitled to a judgment under the applicable law. *Civ.R. 50(A)(4)* and *The Limited Stores, Inc. v. Pan American World Airways, Inc. (1992), 65 Ohio St. 3d 66, 73, 600 N.E.2d 1027*. The court does not weigh the evidence nor determine the credibility of the witnesses when ruling on the motion. *Wagner v. Midwestern Idem. Co. (1998), 83 Ohio St. 3d 287, 294, 699 N.E.2d 507*.

[*P31] The determination of a motion for a directed verdict or a motion for judgment notwithstanding the verdict is a question of law. *Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St. 2d 66, 23 Ohio Op. 3d 115, 430 N.E.2d 935*, paragraph one of the syllabus. [**13] Therefore, this court conducts a de novo review of the trial court's rulings. *Nichols v. Hanzel (1996), 110 Ohio App. 3d 591, 599, 674 N.E.2d 1237*, and *Howell v. Dayton Power & Light Co. (1995), 102 Ohio App. 3d 6, 13, 656 N.E.2d 957*.

[*P32] At trial, High Touch Homes, Inc. moved for a directed verdict on the grounds that there was no proof of breach of warranty or even the existence of a warranty, no proof of a violation of the Consumer Sales Practices Act, and no proof of a breach of contract. Furthermore, it argued that Cattano prevented their efforts to repair the home and that all changes made were with Cattano's consent. In its motion for judgment notwithstanding the verdict, High Touch Homes, Inc. argued that Cattano's claimed violation of the Consumer Sales Protection Act did not survive his death, that there was no proof of a violation of the Act, the damage award was erroneous, and that because appellant's witnesses were incompetent, their testimony should have been stricken.

[*P33] High Touch Homes, Inc. first argues on appeal that Cattano's estate lacked standing to bring a claim that High Touch Homes, Inc. violated the Consumer [**14] Sales Practices Act.

[*P34] At common law, an action at law abated on the death of the plaintiff. *Chilcote v. Hoffman (1918), 97 Ohio St. 98, 101-102, 119 N.E. 364, 15 Ohio L. Rep. 538*. However, if the action survived the death of the plaintiff, the action could be reinstated by the personal representative of the decedent's estate. *State ex rel. Ahrens v. City of Cleveland (1938), 133 Ohio St. 423, 424, 11 Ohio Op. 87, 14 N.E.2d 351*; *Village of Cardington v. Admr. of Fredericks' (1889), 46 Ohio St. 442, 448, 21 N.E. 766*; and *Village of Oakwood v. Makar (1983), 11 Ohio App. 3d 46, 47, 11 Ohio B. 79, 463 N.E.2d 61*. Generally, actions arising out of a contract, actions *ex contractu*, survived the death of a defendant and actions arising out of a tort or offense, actions *ex delicto*, did not. *Loveman v. Hamilton (1981), 66 Ohio St. 2d 183, 184, 20 Ohio Op. 3d 194, 420 N.E.2d 1007* and *Chilcote v. Hoffman, supra at 101*. More specifically, actions which survived the death of the parties included those involving damage to property or where property rights were affected. *Nations Credit v. Pheanis (1995), 102 Ohio App. 3d 71, 79-80, 656 N.E.2d 998*. [**15] Actions involving injury to the person did not survive. *Cincinnati v. Hafer (1892), 49 Ohio St. 60, 65-66, 30 N.E. 197*. Thus, the death of a party gave rise to two issues: 1) abatement of the action and 2) whether the action could be reinstituted by the personal representative.

[*P35] The common law has been modified by several statutes. *R.C. 2311.21*, which provides as follows:

[*P36] "Unless otherwise provided, no action or proceeding pending in any court shall abate by the death of either or both of the parties thereto, except actions for libel, slander, malicious prosecution, for a nuisance, or against a judge of a county court for misconduct in office, which shall abate by the death of either party."

[*P37] Today, therefore, most causes of action do not abate at the death of a party. In those cases, a new party may be substituted for the deceased party pursuant to Civ.R. 25 if the cause of action survives the death of the deceased party. Furthermore, *R.C. 2305.21*, provides that:

[*P38] "In addition to the causes of action which survive at common law, causes of action for mesne profits, [**16] or injuries to the person or property, or for deceit or fraud, also shall survive; and such actions may be brought notwithstanding the death of the person entitled or liable thereto."

[*P39] This statute expands the common law by adding additional causes of actions which survive the death of the injured party and legislatively expresses the common law principle that causes of action regarding injuries to property survive the parties. The statutory term "injuries to the person" means physical injury to the person. *Village of Oakwood v. Makar (1983), 11 Ohio App. 3d 46, 47, 463 N.E.2d 61*.

[*P40] To determine whether the cause of action in a particular case survives the death of a party, the court begins its analysis by first determining whether the cause of action is one listed in *R.C. 2305.21*: "mesne profits, or injuries to the person or property, or for deceit or fraud." If

not, the court must apply the principles of common law to determine if the cause of action survives. First, the court must determine the substance of the action to distinguish whether it involves the injury to property or personal rights. *Loveman v. Hamilton, supra at 184-185.* [**17] The principles of common law permit survival of a cause of action if it is based on a property right. *Chilcote v. Hoffman, supra at 104; Nations Credit v. Pheanis, supra.* An action based upon a "personal right" is non-transferable and, therefore, does not survive the death of that person. *State ex rel. Ahrens v. City of Cleveland (1938), 133 Ohio St. 423, 425-427, 14 N.E.2d 351; Cincinnati v. Hafer, supra;* and *Hodge v. Ohio Bureau of Employment Services (Apr. 15, 1983), 1983 Ohio App. LEXIS 12415,* Lucas App. No. L-83-016 at 5.

[*P41] In the case before us, the cause of action is based upon a statutory right to sue, under the Consumer Sales Practices Act, for unfair or deceptive sales practices. Appellant argues that Cattano's cause of action did not survive his death. It contends that the cause of action did not involve an injury to the person or property under *R.C. 2305.21*.

[*P42] The Consumer Sales Practices Act prohibits unfair or deceptive acts and unconscionable acts or practices by suppliers in consumer transactions. *Einhorn v. Ford Motor Co. (1990), 48 Ohio St. 3d 27, 29, 548 N.E.2d 933.* [**18] By enacting this legislation, the General Assembly intended to give the consumer protections he lacked under common law by eliminating the need to prove intent or knowledge to deceive to establish unfair or deceptive practices. *Karst v. Goldberg (1993), 88 Ohio App. 3d 413, 417-418, 623 N.E.2d 1348,* citing *Thomas v. Sun Furniture and Appliance Co. (1978), 61 Ohio App. 2d 78, 81-82, 11 Ohio Op. 3d 26, 399 N.E.2d 567.* The Consumer Sales Practices Act also provides consumers with additional remedies for the same conduct that might not be available under other statutes or at common law. *R.C. 1345.13.*

[*P43] One appellate court has held that since the cause of action under the Act did not exist at common law and is not an "injury to property," the action did not survive the injured party's death. *Motzer Dodge Jeep Eagle, Inc. v. Ohio Attorney General (1994), 95 Ohio App. 3d 183, 192-193, 642 N.E.2d 20.* Another appellate court has held that if the remedy of recision is sought for the violation of the Consumer Sales Practices Act, the claim survives the death of the injured party because it involves property rights. *Nations Credit v. Pheanis, supra.* [**19] The *Pheanis* court expressly stated that it was addressing only the facts of that case.

[*P44] The issue before us then is whether a distinction should be made based upon the remedy sought. We think not. An action under the Consumer Sales Practices Act is, in essence, a fraud claim. The statute eliminates the element of intent or knowledge and expands the types of remedies available to the consumer to ensure the consumer gets the appropriate relief and to discourage these types of practices by suppliers. Nonetheless the essence of the claim is for fraud. A distinction based upon the remedy sought would not be just. Therefore, we hold that a cause of action under the statute survives the death of the plaintiff pursuant to *R.C. 2305.21*. The executrix of Cattano's estate had standing to bring this action.

[*P45] Appellant also argues that the trial court erred by denying its motion for judgment notwithstanding the verdict because there was no evidence of a violation of the Consumer Sales Practices Act. Appellant contends that there was no proof that it made any misleading or false representations to Cattano or that it influenced his decision to [**20] purchase the home. Appellee asserted at trial that appellant violated *R.C. 1345.02(B)(1)* and (2). *R.C. 1345.02(A)* and *1345.02(B)(1)* and (2) provide as follows:

[*P46] "(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

[*P47] "(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

[*P48] "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

[*P49] "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not."

[*P50] *R.C. 1345.03(A)* provides that:

[*P51] "No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable [**21] act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

[*P52] A consumer establishes a claim under the Act by proving facts that establish an act or practice described in R.C. *Gatto v. Frank Nero Auto Lease, Inc. (Apr. 8, 1999), 1999 Ohio App. LEXIS 1571 at *8,* Cuyahoga App. No. 74894. We find that there was sufficient evidence in this case from which the jury could find that the home Cattano purchased did not meet the standards of the model that he was shown. While appellant did offer to remedy the problems with the home,

there was also evidence from which the jury could conclude that the repairs appellant intended to make were insufficient to remedy the problems with the home.

[*P53] Accordingly, we find appellant's first assignment of error not well-taken.

[*P54] In its second assignment of error, appellant argues that the trial court erred in trebling the damages awarded to appellee.

[*P55] Treble damages may be awarded pursuant to R.C. 1345.09(B), which reads as follows:

[*P56] "Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division [**22] (B)(2) of *section 1345.05 of the Revised Code* before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate *section 1345.02 or 1345.03 of the Revised Code* and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of *section 1345.05 of the Revised Code*, the consumer may rescind the transaction or recover, but not in a class action, three times the amount of his actual damages or two hundred dollars, whichever is greater, or recover damages or other appropriate relief in a class action under Civil Rule 23, as amended."

[*P57] Thus, if an administrative or common law rule declaring that a specific act is an unfair or deceptive practice was established prior to the time the defendant committed the same act, the court may award treble damages for violation of that rule. *Mid-America Acceptance Co. v Lightle (1989), 63 Ohio App. 3d 590, 597, 579 N.E.2d 721*, and *Webb v. Williams (July 30, 1993), 1993 Ohio App. LEXIS 3876 at *3, Lucas App. No. L-92-217*. [**23]

[*P58] Appellant contends that there was no such rule in this case. Appellee asserts that appellant had notice of two rules applicable to this case which were promulgated by the Ohio Attorney General pursuant to R.C. 1345.02(B) in 1978 and 1988 respectively. The first is *Ohio Admin. Code 109:4-3-05(D)*, which reads as follows:

[*P59] "(D) In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to:

[*P60] "***.

[*P61] "(9) Represent that repairs have been made or services have been performed when such is not the fact;"

[*P62] "***."

[*P63] The second is *Ohio Admin. Code 109:4-3-10*, which reads as follows:

[*P64] "It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to:

[*P65] "(A) Make any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims, or assertions are made, the supplier possesses [**24] or relies upon a reasonable

[*P66] basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence which substantiates such representations, claims, or assertions of fact; or

[*P67] "***."

[*P68] Appellant does not refute that these two sections are applicable to this case. There was evidence presented that appellant's employees oversaw the installation of the house and that it was not installed properly. Furthermore, there was evidence that appellant's model home and brochures depicted a home with certain features that Cattano did not receive. Therefore, we find appellant's second assignment of error not well-taken.

[*P69] In its third assignment of error, appellant argues that the trial court erred by failing to dismiss Count Two of appellee's complaint. In Count Two of his complaint, appellee contended that appellant breached the contract between the parties. Appellant sought to have this cause of action dismissed because the contract at issue specifically limited the time for bring a claim of breach of contract to one year after the breach. Appellant contends that Cattano was on notice [**25] of any breach as of September or November 1995 when he had access to the home. However, the executrix of Cattano's estate did not file this action until January 1997. Appellee contends that the breach did not occur until September 1996 at the latest. She argues that

[*P70] while Cattano was aware of the defects in the home in 1995, appellant did not breach the contract until September 1996 when it became apparent to her that appellant could not repair the home.

[*P71] Where the facts are not disputed, the determination of whether a certain act constitutes a breach of contract is a question of law. *Luntz v. Stern (1939), 135 Ohio St. 225, 14 Ohio Op. 62, 20 N.E.2d 241*, paragraph five of the syllabus. In this case it is clear that while the defects in the home were evident by November 1995, appellee could not have known that appellant would not repair the home to Cattano's satisfaction until sometime after January 1996. Therefore, the exact time that the

breach occurred would be a factual issue that needed to be determined. However, for purposes of this assignment of error it is sufficient that we determine that the alleged breach occurred sometime after January 1996, less [**26] than one year before the complaint was filed. Therefore, we find that appellee met the statute of limitations clause of the contract. Appellant's third assignment of error is not well-taken.

II

[*P72] In her first cross-assignment of error, appellee argues that the trial court erred as a matter of law when it denied her motion for default judgment. She also argues in her

[*P73] second assignment of error that the trial court erred by allowing appellant to file its answer outside of the time frame mandated by Civ.R. 12.

[*P74] Appellee's complaint was served upon appellant on January 31, 1997. Under Civ.R. 12(A), appellant was required to file his answer within twenty-eight days, plus three days for mailing pursuant to Civ.R. 6(E). The certified mail return receipt was filed on February 3, 1997. Thus, appellant's answer was due on March 1, 1997. Appellant did not file its motion to dismiss the complaint until March 31, 1997, which was granted as to Count One and denied as to the other counts on October 2, 1998. If a timely motion to dismiss is filed, an answer to the complaint is due fourteen days after the ruling on the motion. App.R. 12(A)(2). Appellant was required [**27] to file his answer by October 16, 1998.

[*P75] On November 17, 1998, appellee filed a motion for default judgment pursuant to Civ.R. 55 and appellant filed its answer to the complaint. On December 1, 1998, appellant filed its memorandum in opposition to appellee's motion for default judgment and a motion to file its answer instanter. The trial court denied appellee's motion for default judgment on March 2, 1999, and granted appellant's motion to file its answer instanter on April 9, 1999.

[*P76] Civ.R. 55 provides, in pertinent part, as follows:

[*P77] "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules, the party entitled to a judgment by default shall apply in writing or orally to the court therefor; ***."

[*P78] This rule gives the trial court the discretion to enter a default judgment against a party who has failed to defend an action in compliance with the Ohio Rules of Civil Procedure. The phrase "otherwise defend" has been defined by the courts as referring to "attacks on the service, or motions to dismiss, or for better particulars, and the like, which may prevent [**28] default without presently pleading to the merits. ***" *Reese v. Proppe (1981), 3 Ohio App. 3d 103, 106, 3 Ohio B. 118, 443 N.E.2d 992,* quoting *Bass v. Hoagland (1949), 172 F.2d 205, 210,* certiorari denied (1949), *338 U.S. 816, 94 L. Ed. 494, 70 S. Ct. 57.*

[*P79] Thus, in this case, appellant's filing of a motion to dismiss operated as a defense to the action. However, the issue remains whether the trial court abused its discretion by permitting appellant to file its answer to the complaint on April 9, 1999 rather than on October 16, 1998 after it attempted to file its answer on November 17, 1998 and did not even request leave to file its answer late until December 1, 1998.

[*P80] The trial court's determination as to whether to permit a defending party to file a late answer pursuant to Civ.R. 6(B)(2) upon a finding of excusable neglect, is a discretionary decision which is reviewed under an abuse of discretion standard. *Miller v. Lint (1980), 62 Ohio St. 2d 209, 214-215, 16 Ohio Op. 3d 244, 404 N.E.2d 752,* and *McDonald v. Berry (1992), 84 Ohio App. 3d 6, 10, 616 N.E.2d 248.* However, the court's discretion is more narrow once [**29] a motion for default judgment has been filed. *Black v. Oakes (June 26, 2001), 2001 Ohio App. LEXIS 2941,* Franklin App. No. 00AP-1133, unreported. In order to find that the trial court abused its discretion, we must find more than it made an error of law; we must find that the court acted in an unreasonable, unconscionable, or arbitrary manner. *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd. (1992), 63 Ohio St. 3d 498, 506, 589 N.E.2d 24.*

[*P81] Without indicating the basis for its "excusable neglect," appellant contends that the trial court found excusable neglect and that its decision cannot be overturned because appellee has failed to show that the trial court abused its discretion. In its memorandum in opposition to appellee's motion for default judgment and its own motion to file its answer instanter, appellant argued that it has been defending this case since the beginning by filing a motion to dismiss. Furthermore, it argued that it would be unfair to render default judgment against appellant after the court had granted another party relief from their default judgment so that they could join in appellant's motion to dismiss. Finally, appellant argued that

[*P82]    [**30] the failure to file a timely answer was the result of excusable

[*P83]    neglect. Counsel for appellant acknowledged that he failed to remember to file an answer because of the eighteen month period that the motion to dismiss was pending and his enthusiasm to begin the discovery process.

[*P84] Upon consideration of the facts of this case, we find that the trial court did not abuse its discretion by denying appellee's motion for default judgment. Appellee's second cross-assignment of error is not well-taken.

[*P85] In her third cross-assignment of error, appellee argues that the trial court erred by dismissing Count One of her complaint in which she alleged a common law claim of fraudulent concealment.

[*P86] A complaint should be dismissed for failure to state a claim upon which relief may be granted if it appears beyond a doubt that the plaintiff cannot prove the necessary set of facts to support his claim and entitle him to relief. *State ex rel. Hanson v. Guernsey Cty. Bd. of Comm'rs. (1992), 65 Ohio St. 3d 545, 548, 605 N.E.2d 378.* In deciding a Civ.R. 12(B)(6) motion, the court must presume that all of the factual allegations of the complaint [**31] are true and make all reasonable inferences in favor of the non-moving party. *York v. Ohio State Hwy. Patrol (1991), 60 Ohio St. 3d 143, 144, 573 N.E.2d 1063.* The appellate court applies the same standards

[*P87] as the trial court and, therefore, reviews the determination of whether to grant judgment on the pleadings de novo. *McGlone v. Grimshaw (1993), 86 Ohio App. 3d 279, 285, 620 N.E.2d 935.*

[*P88] Civ.R. 9(B) requires that the circumstances constituting fraud must be pled with particularity: "the time, place, and content of the false representation; the fact misrepresented; the identification of the individual giving the false representation; and the nature of what was obtained or given as a consequence of the fraud." *Aluminum Line Products Co. v. Brad Smith Roofing Co., Inc. (1996), 109 Ohio App. 3d 246, 259, 671 N.E.2d 1343.*

[*P89] However, Civ.R. 9(B) must be read in conjunction with Civ.R. 8, which provides that pleadings should provide a "short and plain statement of the claim." Read together, these rules require that allegation of fraudulent concealment must be detailed enough to give the defendant notice [**32] of the allegation in order to prepare a defense. *Baker v. Conlan (1990), 66 Ohio App. 3d 454, 458, 585 N.E.2d 543,* and *F. & J. Roofing Co. v. McGinley & Sons, Inc. (1987), 35 Ohio App. 3d 16, 17, 518 N.E.2d 1218.*

[*P90] The Supreme Court of Ohio identified the *prima facie* elements of a fraudulent concealment claim in *Burr v. Bd. of Cty. Commrs. Stark Cty. (1986), 23 Ohio St. 3d 69, 491 N.E.2d 1101,* paragraph two of the syllabus as follows:

[*P91] "1) a representation or, where there is a duty to disclose, concealment of a fact,

[*P92] "2) which is material to the transaction at hand,

[*P93] "3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

[*P94] "4) with the intent of misleading another into relying upon it,

[*P95] "5) justifiable reliance upon the representation or concealment, and

[*P96] "6) a resulting injury proximately caused by the reliance."

[*P97] In a statement of the facts, appellee alleged that in June 1995 when Cattano first contacted appellant about purchasing [**33] a home, he was told by Jones that the home complied with the Code and provided him with a Letter of Certification to prove this fact. Appellee alleged in Count One that appellant knew that the home was not in compliance with the Ohio Basic Building Code (hereafter "Code"); that appellant knowingly and intentionally misled Cattano to believe that the home was in compliance; that appellant knowingly and intentionally failed to comply with Code Section 4101:2-1-62 by omitting required insignia number stickers on the two halves of the home shipped to Cattano and deliberately failed to provide Cattano with the original Letter of Certification as required by the Code because it gave him the Letter of Certification prior to the manufacture of the home and not the red-ink stamped certificate that corresponded with the unit actually shipped to him; and that as a result Cattano purchased and accepted the home as being in compliance with the Code. Appellee also alleged that appellant knowingly and falsely represented to Cattano that the front porch had been properly constructed with footers and a foundation. Appellee alleged that Cattano relied upon these representations and accepted the home [**34] as ready for occupancy.

[*P98] We find that the trial court erred by dismissing this count. There is sufficient detail in the allegation to inform appellant of the claim so that it could prepare a defense. Appellee's third cross-assignment of error is well-taken.

[*P99] In her fourth cross-assignment of error, appellee argues that the trial court erred by failing to award her actual damages pursuant to *R.C. 1345.09(A)* and treble damages pursuant to *R.C. 1345.09(B).* Appellee cites to no case to support her position. Instead, she relies only upon her interpretation of *R.C. 1345.09(A)* and (B).

[*P100] *R.C. 1345.09(A)* and (B) provide as follows:

[*P101] "(A) Where the violation was an act prohibited by *section 1345.02* or *1345.03 of the Revised*

*Code*, the consumer may, in an individual action, rescind the transaction or recover his damages.

[*P102] "(B) Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of *section 1345.05 of the Revised Code* [**35] before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate *section 1345.02* or *1345.03 of the Revised Code* and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of *section 1345.05 of the Revised Code*, the consumer may rescind the transaction or recover, but not in a class action, three times the amount of his actual damages or two hundred dollars, whichever is greater, or recover damages or other appropriate relief in a class action under Civil Rule 23, as amended."

[*P103] We read these two provisions as being mutually exclusive. A consumer can elect between the remedies of recision or damages and, if the consumer can prove that the supplier should have known that his actions constituted a violation of the Act, the consumer can elect between recision and damages equal to three times his actual damages up to $ 200. This holding is supported by the dicta in *Stultz v. Artistic Pools, Inc. (Oct. 10, 2001), 2001 Ohio App. LEXIS 4561* at *8, Summit App. No. 20189, citing *Armstrong* [**36] *v. Kittinger (Sept. 21, 1994), 1994 Ohio App. LEXIS 4465* at *26-27, Summit App. No. 16124 and 16378, where the court stated that *R.C. 1345.09* provides that the consumer, who proves that a supplier has violated the Act and meets the prerequisites for treble damages under *R.C. 1345.09(B)*, can elect either recision of the contract or treble damages, not actual damages versus treble damages. See, also, *Mid-America Acceptance Co. v. Lightle (1989), 63 Ohio App. 3d 590, 597, 579 N.E.2d 721*. Therefore, we conclude that the court may not award a party actual damages and treble damages. Accordingly, we find appellee's fourth cross-assignment of error not well-taken.

[*P104] Having found that the trial court committed error prejudicial to appellee, the judgment of the Erie County Court of Common Pleas is affirmed in part and reversed in part. The judgment is reversed only as to the dismissal of Count One of appellee's complaint. In all other respects, the judgment of the court is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the costs incurred in connection with this appeal.

JUDGMENT AFFIRMED, IN PART AND REVERSED, IN PART.

[**37] Peter M. Handwork, J.

Melvin L. Resnick, J.

James R. Sherck, J.

CONCUR.

LEXSEE

**Estate of Cattano v. High Touch Homes, Inc.**

**2002-1046.**

**SUPREME COURT OF OHIO**

*96 Ohio St. 3d 1513; 2002 Ohio 4950; 775 N.E.2d 856; 2002 Ohio LEXIS 2307*

**September 25, 2002, Decided**

**NOTICE:** [*1] DECISION WITHOUT PUBLISHED OPINION

**PRIOR HISTORY:** Erie App. No. E-01-022.

*Estate of Cattano v. High Touch Homes, Inc., 2002 Ohio 2631, 2002 Ohio App. LEXIS 2754* (Ohio Ct. App., Erie County 2002).

**JUDGES:** Moyer, C.J., and Lundberg Stratton, J., dissent. Resnick, J., not participating.

**OPINION:**

**APPEAL NOT ACCEPTED FOR REVIEW**

Moyer, C.J., and Lundberg Stratton, J., dissent.

Resnick, J., not participating.