IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PATRICIA A. DAFFIN, | : Case No. C-1-00-458 |
| Plaintiff, | : Judge Susan J. Dlott |
| v. | : |
| FORD MOTOR COMPANY, INC., | : **MEMORANDUM OF PLAINTIFF** |
| | : **IN RESPONSE TO FORD'S** |
| | : **MOTION TO CLARIFY ORDER** |
| Defendant. | : **FOR STATE-WIDE CLASS** |
| | : **CERTIFICATION (DOC. #109)** |

Over two years ago, the Court certified an Ohio state class action against Ford Motor Company ("Ford"). Dkt. #93. In its Order, the Court rejected Ford's arguments that this case was too complicated for class treatment: "[t]his class deals with few claims, analyzed under Ohio law." *Id.* at 14. Not deterred, Ford requested the Court to reconsider certification (Dkt. #94), which was promptly denied. Dkt. #101. Ford was then permitted a Rule 23(F) appeal to the Sixth Circuit Court, which upheld certification. Ford now argues in its Motion for Clarification for an artificially narrow reading of the Court's certification order.

First, there is no dispute that the Court certified the express warranty claim, but not the implied warranty claim. Dkt. #109 at 4. What is disputed is whether the three remaining claims- negligent manufacture, negligent design, and the Ohio Consumer Sales Practices Act- were certified. Ford contends that the Court did not certify these three claims, conceding only the certification of the express warranty claim. Dkt. #109 at 7.

However, a fair reading of the certification order reveals that the Court certified claims other than the implied warranty claim. After all, this Court referred in its Certification Order to multiple "claims" as being at issue in this case, not a single claim. Dkt. #93 at 14. However, as Class Counsel related to the Court at the status conference

on October 6th, the Court's certification decision shapes this case in a manner such that it is not necessary for the class to proceed with the negligent design and manufacture claims. Further, given Ford's indication at the conference that it may seek another Rule 23(F) appeal for the other claims, Class Counsel, while disagreeing with Ford as to any further right to appeal, avoids much of this issue if these two claims are not certified. However, Plaintiff's Ohio Consumer Sales Practices Act claim (§1345.01 et seq.) ("CSPA") is critical here since the combination of the express warranty claim with the CSPA claim affords broad relief to the class, including discretionary attorney fees. In short, these claims compliment each other and are consistent with relief based on diminution of value. See Dkt. #93 at 13-14.

### A.   This Court certified the CSPA claim

As noted, a fair reading of this Court's Order reveals that multiple claims were certified: "[t]his class deals with few claims, analyzed under Ohio law." Dkt. #93 at 14. These "few claims" obviously included more than the single express warranty claim. As for the CSPA claim in particular, and as Plaintiff argued in the moving papers (See, e.g., Dkt. #98, pg. 8), a failure to honor an express warranty presents a classic CSPA violation.[1] See *Lump v. Best Door & Window, Inc.*, 2002 Ohio 1389 (Logan Cty. 2002) ("failure to honor an express warranty has been held to constitute a violation of R.C. 1345.02."); *Layne v. McGowen*, 1995 Ohio App. LEXIS 2120 (Montgomery Cty. 1995) (same) (attached as Ex. 1); *Brown v. Lyons*, 43 Ohio Misc. 14, 19 (Ohio Misc. 1974) ("Failure by a supplier in connection with a consumer transaction to honor express warranties, constitutes deceptive acts and practices in violation of the Ohio Consumer Sales Practices Act, R. C. 1345.02(A). This failure also constitutes a violation of R. C.

---

[1] This is merely one aspect of Ford's violation of the CSPA, as detailed in Plaintiff's First Amended Complaint. See Dkt. #34 at ¶66-77. Other violations of the CSPA include Ford's failure to disclose the defective throttle body assembly, Ford's failure to adequately and properly test the 1999 and 2000 Villager before placing the product on the market, and Ford's failure to disclose to plaintiff and consumers that throttle body assemblies being used in "repairs" are of the same defective design as those originally installed in the vehicle. *Id.* at ¶69.

1345.02(B)(10)."); *Fletcher v. Don Foss of Cleveland, Inc.*, 90 Ohio App. 3d 82, 86 (Cuyahoga Cty. 1993) (violation of the CSPA to tell a consumer that something was under "warranty" and then refuse to take any action to remedy a problem when the goods promptly break down.)

Thus, in certifying the express warranty claim, the Court certified the CSPA claims. This is confirmed by the Court's reasoning later in the decision that "[s]hould Daffin be considered a non-commercial consumer, her CSPA claim would be typical of those who purchased their vehicles for personal use." Dkt. #93 at 6. While Plaintiff disputes that there is legitimate issue of fact as to whether Ms. Daffin was a non-commercial consumer, this Court rightfully noted in any event that "the issue is not properly decided here." *Id.* at 5. Thus, the CSPA claims were clearly certified.

Ford nevertheless suggests that the issue of whether Ms. Daffin was a non-commercial consumer precludes class treatment of the CSPA claim. Dkt. #109 at 6. This argument is without foundation. Indeed, Rule 23(A)(2) ***requires*** that there be "questions of law or fact common to the class." Here, a common question of fact identified by the Court is whether Ms. Daffin purchased the vehicle for a purpose which is "primarily personal." Dkt. #93 at 5. Ford argues contrary to Ohio law by stating that "[d]etermining the purpose for which someone bought his or her vehicle is an inherently individualized exercise, requiring claimant-specific discovery (including depositions) and jury trials to resolve disputes." Dkt. #109 at 5. But Ford does not cite any examples of a court denying certification on this basis. Further, if the threshold issue of whether a class representative is a non-commercial consumer were sufficient to deny certification, no class action could ever be certified under the CSPA. Such a result would be directly contrary to the plain language of §1345.09 of the CSPA, which specifically authorizes class actions. Furthermore, courts have repeatedly certified even automobile defect cases under the CSPA without engaging in the analysis Ford claims is necessary here. See, e.g. *Amato v. General Motors Corp.*, 11 Ohio App. 3d 124 (Cuyahoga Cty. 1982).

At any rate, despite Ford's assertions, in reality there is little doubt that Ms. Daffin purchased her Villager primarily for her personal use, rendering Ford's argument baseless. Ms. Daffin testified that she "normally" uses her Villager for "general purposes use: errands, recreation, ... the ordinary use of a pleasure vehicle." Dkt. #66, Exh. E, Daffin Dep. at 48:19-24, 51:7-11. And even when she uses it to accompany her husband on his business trips, those trips also consist of recreational travel and she receives no reimbursement from her husband's employer. *Id.* at 49:20-24. She also made it clear that she was not involved in her husband's business. *Id.* at 47:22 – 48:1. And notably, her Villager's title and registration are in her own name, not that of a business entity. Dkt. #66, Exh. F.

But regardless of whether this factual issue is fairly in dispute, this Court has already concluded that it need not resolve it at the class certification stage because a Court reviewing a request for certification must not look into the merits of a plaintiff's claim. See *Ojalvo v. Board of Trustees*, 12 Ohio St. 3d 230, 233 (1984), citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) ("Class action certification does not go to the merits of the action.") The pleadings clearly identified Ms. Daffin as a non-commercial consumer. Dkt. #34 at ¶67. Furthermore, as the Court noted, there is evidence beyond the pleadings that "Daffin purchased the Villager for personal use." Dkt. # 93 at 5. This is clearly sufficient to support Ms. Daffin's typicality as a class representative for the CSPA claim.[2] See *Ojalvo*, 12 Ohio St. 3d 230.

---

[2] However, should the Court find that Ms. Daffin does not satisfy typicality for the CSPA claims, Plaintiffs should be permitted leave to add an additional class representative. Ohio courts recognize and permit the substitution of class representatives when necessary to maintain a class action: "[D]oubts about adequate representation, potential conflicts, or class affiliation should be resolved in favor of upholding the class, subject to the trial court's authority to amend or adjust its certification order as developing circumstances demand, ***including the augmentation or substitution of representative parties***." *Baughman v. State Farm* (2000), 88 Ohio St. 3d 480, 487-488, 2000 Ohio 397, 727 N.E.2d 1265, 1272-1273 (emphasis added). Thus, if necessary, the Court should permit leave for the addition of another class representative.

## CONCLUSION

A fair reading of the certification order makes it clear that the CSPA claim was certified and that Ms. Daffin is a proper class representative. To conclude otherwise would require an inquiry into the merits of the action, which this Court properly refused to make. Second, as a failure to honor an express warranty in Ohio is also a CSPA violation, the Court certainly certified the CSPA claim in addition to the express warranty claim.[3] Far from being "a dramatic departure from the previous path of this litigation" as Ford posits (Dkt. #109 at 7), this reflects the most sensible reading of the Court's certification order. It also places the class in the best position to achieve the full and complete relief they seek, as the CSPA affords broad relief.

Respectfully submitted,

s/John C. Murdock
John C. Murdock (0063749)
Jeffrey S. Goldenberg (0063771)
Theresa L. Groh (0029806)
Murdock Goldenberg Schneider & Groh, LPA
35 East Seventh Street, Suite 600
Cincinnati, Ohio 45202-2011
(513) 345-8291 Telephone
(513) 345-8294 Facsimile
**Counsel for Plaintiff**

Sean R. Matt, Esq.
Steve W. Berman, Esq.
Hagens Berman
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
(206) 224-9327 Telephone
(206) 623-0594
**Co-Counsel Admitted Pro Hac Vice for Plaintiff**

---

[3] As noted supra at ftn. 1, Ford violated the CSPA in numerous ways, of which the failure to honor the express warranty is but one example.

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Gary M. Glass, Esq., John F. Niblock, Esq., Brian C. Anderson, Esq. and David A. Eberly, Esq..

                                                            s/John C. Murdock

LEXSEE 1995 OHIO APP. LEXIS 2120

WILLIAM LAYNE, et al., Plaintiffs-Appellants v. GLEN MCGOWEN, et al., Defendants-Appellees

C.A. CASE No. 14676

COURT OF APPEALS OF OHIO, SECOND APPELLATE DISTRICT, MONTGOMERY COUNTY

*1995 Ohio App. LEXIS 2120*

**May 24, 1995, Rendered**

**NOTICE:** [*1] THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION.

**PRIOR HISTORY:** T.C. CASE NO. 92-4558.

**COUNSEL:** CHRISTOPHER M. GEE, Atty. Reg. No. 0020261, 103 N. Miami Street, West Milton, Ohio 45383, Attorney for Plaintiffs-Appellants.

STEPHEN KLEIN, Atty. Reg. No. 0014351, 282 Bohanan Drive, Vandalia, Ohio 45377, Attorney for Defendants-Appellees.

**JUDGES:** WOLFF, J. BROGAN, P.J. and FAIN, J., concur.

**OPINION BY:** WOLFF

**OPINION:**

OPINION

WOLFF, J.

William and Joan Layne appeal a directed verdict in favor of Glen McGowen, Eric McGowen, Tru-Built Garage Builders, Inc., and Tru-Built Garage & Lumber Co., Inc. ("Tru-Built") on a claim of a violation of the Consumer Sales Practices Act.

The following statement of facts is drawn from the transcript of the proceedings before the Montgomery County Court of Common Pleas.

On March 4, 1992, William Layne ("Layne") contracted with Tru-Built to build a detached garage on his property. The pre-fabricated garage was to be situated sixty-four feet behind the house and measure twenty-four feet by twenty-five feet in dimension. The contract price was $ 7,196, with $ 2,398 due as a downpayment, $ 2,398 due when the concrete [*2] was installed, and the remaining $ 2,400 due upon completion of the project. Layne paid the $ 2,398 downpayment on March 4 at the time the contract was executed.

According to the contract, work was to begin within 60 days of the date of the contract, and the garage was to be completed within 90 days, excepting delays due to weather and conditions beyond Tru-Built's control. The reverse side of the contract stated the "Tru-Built Garage Guarantee." The guarantee listed specific coverages, not relevant to this dispute, and also stated:

> Any other part of the garage not mentioned herein is covered by TRU-BUILT'S complete guarantee to fix, replace or repair any part that goes wrong, that is our fault, because of poor workmanship or faulty materials for one full year at absolutely no cost to you.

Around March 31, 1992, Tru-Built dug a trench for the concrete floor. Over the next week, significant precipitation fell and the building inspector, Dwain Jacobs, prohibited Tru-Built from pouring the concrete until the ground dried. On April 6, the cement was poured for the garage floor. That same day, Layne and his wife noticed that the concrete pad was not aligned with the house. [*3] While the pad was in the correct location, it was rotated one or two feet.

Layne immediately called the Tru-Built salesman with whom he had executed the contract, Eldon Holton, who said that he would come to the house and look at the pad. When Layne called Holton back later that night or the next day, Holton had seen the pad and agreed that there was a problem. Holton said that he would talk to

Eric McGowen, the regional sales manager in Indiana and part-owner of the company.

Layne also contacted Jacobs, the building inspector and a personal friend, and informed him that a misaligned pad had been poured. Jacobs talked to the contractor and informed him that the situation would have to be corrected. In addition, the contractor had not obtained the required footer inspection prior to pouring the concrete, and Jacobs told the contractor that, as a result of that failure, he could not continue with the work at that time.

Layne called Holton approximately two days after their previous conversation and Holton said that Layne should have already received a call from McGowen. Holton provided Layne with McGowen's phone number and Layne called the next day. According to Layne, McGowen denied [*4] having any knowledge of the situation. McGowen testified, however, that he was first informed of the problem with the pad by Holton, not Layne. Layne further alleged that he and McGowen then engaged in a heated discussion during which McGowen allegedly said such things as, "a garage doesn't have to be straight when it's sixty feet behind the house." McGowen, on the other hand, testified that his initial discussion with Layne was not heated nor were "hot words" exchanged. McGowen told Layne that he would check with the contractor who had installed the cement pad, Ron Blade.

Layne testified that someone came to the house to look at the pad at McGowen's request. The next time Layne and McGowen talked, McGowen agreed that the pad was not aligned properly. Layne testified that McGowen proposed that Tru-Built build the garage on the existing pad and if Layne was not satisfied with the garage at that point, then McGowen would remedy the problem. Apparently, this solution was not satisfactory to Layne.

McGowen personally viewed the site in mid-April, when he was in the area. McGowen spoke with Layne at the site and agreed that the pad was not properly aligned. McGowen told Layne that he [*5] would call Layne within a couple of days to discuss remedies, which he did. Layne testified at trial that during this phone conversation, McGowen stated that it was Layne's fault that the concrete pad was not aligned because Layne was not watching the concrete being poured. McGowen's testimony did not address this claim.

McGowen suggested to Layne over the phone that four pie-shaped pieces of concrete be poured along each edge of the existing pad to align the pad to the house. These wedges would be pinned to the existing pad with rebars and the resulting surface would be twenty-eight feet square, a larger garage than originally planned. McGowen indicated that his engineer had approved the idea as a workable solution. Layne would pay an additional $ 804 that would cover the cost of the additional concrete, but the cost of the additional lumber required over the amount in the original contract would be borne by Tru-Built.

Layne maintained that he wanted the existing concrete removed and an entirely new pad installed. McGowen responded that Blade was not willing to admit any deficiency in his work and would not remove the existing pad at his own expense. Blade maintained that the pad [*6] was properly aligned since it was parallel to a row of hedges nearby along the edge of the property. Layne testified that McGowen was reluctant to have the work redone due to the substantial expense that would have to be borne by Tru-Built.

On June 1, 1992, Layne's counsel, Christopher Gee, sent a letter to Holton offering two options: either Tru-Built could remove the existing slab and redo the work in the correct position, or Tru-Built could "patch around the existing slab in order to straighten it out, resulting in a larger garage." Either of these options were to be accomplished at Tru-Built's expense. McGowen testified that he never received a copy of this correspondence.

On June 16, 1992, Gee and McGowen negotiated a solution over the telephone that matched an earlier proposal by McGowen to Layne. The pad was to be expanded by pinning concrete wedges to the existing concrete pad and Layne was to pay an additional $ 804 for the resulting larger garage. Per Layne's request, the work was to be supervised by McGowen and completed within 30 days. Gee faxed a letter to McGowen on June 17 confirming the agreement and requesting written acceptance of the agreement. McGowen faxed a [*7] written acceptance on July 2, 1992, indicating that Tru-Built would commence work the following week and phone Layne in advance of their arrival.

Approximately one week later, Rick Brewer, a contractor, arrived on the site to perform the work on behalf of Tru-Built. No prior call had been made to Layne. Layne testified that Brewer stated that the garage would not last if the concrete was poured as planned. Brewer began to work on the existing concrete pad and discovered that he would need a different trencher than the one he brought that day. Brewer returned the next day with a different trencher, at which time Layne called Jacobs, the building inspector, and asked him to come to the site.

Jacobs and Brewer together called McGowen, and Jacobs informed McGowen that he had two alternatives. Either Tru-Built could pin the wedges to the sides of the existing pad and then pour a layer of concrete over the whole pad, or remove the existing pad and start from scratch. Jacobs informed McGowen that unless one of

these two options was chosen, no further work was to be done on the site. Brewer, Jacobs, McGowen, and Layne all agreed to the pinning and capping idea, but Brewer never finished [*8] the job. He left the site telling Layne that he would have the pad finished within the following two days. However, it then rained for days and both Layne and McGowen were unable to contact Brewer again.

On July 29, 1992, Gee sent a letter to McGowen ordering him to complete the garage by August 10. Shortly thereafter, McGowen arranged for a contractor from Cincinnati to complete the work. When that contractor began working on the site, Layne did not like what he was doing and asked Jacobs to come over. The contractor talked with the inspector and with McGowen and then left and did not return. The deadline for completion of the project was then extended to at least the end of August.

Layne and McGowen continued to negotiate. The solution previously agreed to was problematic since the height of the pad would be increased by approximately four inches. Around August 27, Layne and McGowen finally agreed that Tru-Built would remove the existing concrete pad and refund Layne's downpayment. On September 2, another contractor came to the site with a backhoe to remove the pad. However, in trying to break up the concrete, the backhoe apparently broke. The contractor left and Layne thought [*9] he would be back the next day, but he did not return.

At this point, Layne decided to terminate his relationship with Tru-Built. On September 3, 1992, Gee faxed a letter to McGowen advising him that Tru-Built was to have no further contact with Layne.

On October 8, 1992, Layne filed a complaint against Tru-Built alleging breach of contract and violations of the Consumer Sales Practices Act, R.C. Chapter 1345. At the close of all the evidence, the trial court granted a directed verdict against Layne on the Consumer Sales Practices Act claim. The jury returned a verdict in favor of Layne on the breach of contract claim and awarded $ 6,277.

Layne presents one assignment of error, framed as an assertion.

A TRIAL COURT ERRS IN DIRECTING A VERDICT IN FAVOR OF A SUPPLIER WHERE A CONSUMER MAKES A PRIMA FACIE CASE ON A CONSUMER COMPLAINT.

Layne argues that an unrebutted prima facie case was established at trial that Tru-Built committed numerous unfair, deceptive, or unconscionable consumer sales practices in violation of the Ohio Consumer Sales Practices Act, and that the consumer complaint should have been submitted to the jury for consideration. Layne further argues that [*10] sufficient evidence was presented to justify awards of treble damages and attorney fees under the statute.

A directed verdict is appropriate when the court, "construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted *** ." *Civ. R. 50(A)(4)*. A motion for directed verdict tests "the legal sufficiency of the evidence to take the case to the jury." *Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68.* All reasonable inferences are construed in favor of the party against whom the motion is directed, and the truth of the evidence supporting the claim of that party is assumed. *Id.* "If there is substantial competent evidence to support the [claim of the] party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." *Ramage v. Central Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97, 109* (citations omitted).

The Consumer Sales Practices Act prohibits suppliers from committing unfair or deceptive acts or practices in connection with a [*11] consumer transaction. *R.C. 1345.02(A).* Similarly, suppliers may not commit an unconscionable act or practice in connection with a consumer transaction. *R.C. 1345.03(A).* Further, the Act explicitly provides:

> Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of *section 1345.05 of the Revised Code* before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate *section 1345.02* or *1345.03 of the Revised Code* and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of *section 1345.05 of the Revised Code*, the consumer may rescind the transaction or recover *** three times the amount of his actual damages or two hundred dollars, whichever is greater *** .

*R.C. 1345.09(B)*. The rules adopted by the attorney general pursuant to *R.C. 1345.05(B)(2)* are found at Ohio Administrative Code Chapter 109:4-3.

Layne argues in his brief that a consumer need not prove fraud to establish a claim under the Act. We agree that intent to deceive is not an element of a claim under *R.C.* [*12] *1345.02*. *Smaldino v. Larsick (1993), 90 Ohio App.3d 691, 697; Frey v. Vin Devers (1992), 80 Ohio App.3d 1, 6; Funk v. Montgomery AMC/Jeep/Renault (1990), 66 Ohio App.3d 815, 823; Thomas v. Sun Furniture and Appliance Co. (1978), 61 Ohio App.2d 78,* syllabus. Layne argued to the trial court that a claim under the Act did not require proof of fraud, and the judge responded, "You're talking about deceptive practices and coming within it at the time of the statute and frankly I don't see it." The record does not definitively demonstrate that the trial court believed that Layne was required to prove fraud under the statute. Nevertheless, there was evidence in the record of deceptive and unconscionable practices as articulated in the statute and by caselaw.

Layne argues that Tru-Built committed several acts and engaged in practices that have been previously determined to be unfair, deceptive, or unconscionable by courts of this state.

First, he alleges that Tru-Built accepted a deposit from him without indicating a refund policy. The attorney general has promulgated the following rule:

> It shall be a deceptive act or practice in connection with a consumer transaction [*13] for a supplier to accept a deposit unless the following conditions are met: ***
>
> (B) All deposits accepted by a supplier must be evidenced by dated receipts stating the following information: ***
>
> (5) Whether the deposit is refundable and under what conditions *** .
>
> (C) For purposes of this rule "deposit" means any amount of money tendered or obligation to pay money incurred by a consumer as a deposit, refundable or non-refundable option, or as partial payment for goods or services.

*Ohio Adm.Code 109:4-3-07*. Several decisions, including one from this court, have also found that accepting a deposit from a consumer without indicating a refund policy violates the Act. *Bierlein v. Alex's Continental Inn, Inc. (1984), 16 Ohio App.3d 294; Daniels v. True (1988), 47 Ohio Misc.2d 8, 10; Riley v. Enterprise Furniture Co. (1977), 54 Ohio Misc. 1, 2-3; Brown v. Lyons (1974), 43 Ohio Misc. 14, 20.* It is undisputed that Tru-Built accepted a deposit from Layne as partial payment for the garage, and that no oral or written refund policy was expressed to him.

Second, Layne argues that Tru-Built engaged in a pattern of inefficiency and [*14] incompetency, and continually stalled and evaded its legal obligations to him. In support of his argument, Layne notes that the concrete pad was installed improperly and never repaired, replaced, or removed, and that his deposit was never refunded. In addition, there is evidence in the record that Tru-Built did not communicate promptly with Layne, and that Tru-Built Garage Builders, Inc. is not a corporation despite the inclusion of "Inc." in the name.

This court has upheld a finding of a violation of *R.C. 1345.03* where a supplier engaged in a pattern of inefficiency, incompetency, and continual stalls. *Pearson v. Tom Harrigan Oldsmobile-Nissan, Inc.* (Sept. 16, 1991), Montgomery App. No. 12411, unreported (numerous unsuccessful attempts to complete auto repairs to consumer's satisfaction). See, also, *Brown, supra* (supplier concealed his true identity, frequently changed names and locations of his business, failed to answer his phone for unreasonable lengths of time, failed to return calls to consumers, and sold defective merchandise and thereafter failed to honor warranties); *Daniels, supra* (supplier falsely held himself out as a corporation, listed his address at a location [*15] he had not occupied for years, and failed to respond to repeated phone messages).

Third, Layne argues that Tru-Built failed to honor an express warranty. The contract executed by Layne stated that Tru-Built would fix, replace, or repair any "part that goes wrong," at the fault of Tru-Built, because of poor workmanship or faulty materials, at no cost to Layne. It is undisputed that the concrete pad was wrong, due to the fault of Tru-Built, and that it was not fixed, replaced, or repaired. Failure to honor an express warranty has been held to constitute a violation of *R.C. 1345.02*. *Brown, supra*.

Layne presented substantial competent evidence in support of his claim that the Consumer Sales Practices Act had been violated. Further, Layne presented credible

evidence that he was entitled to recover treble damages under *R.C. 1345.09(B)*. Reasonable minds could reach different conclusions based on this evidence. Therefore, we find that the trial court erred in granting Tru-Built's motion for a directed verdict.

Three additional matters raised by the parties in their briefs merit discussion. First, Layne contends that he is entitled to recover attorney fees under the Consumer Sales Practices [*16] Act. The Act provides that a consumer may recover reasonable attorney fees, limited to the work reasonably performed, if the supplier "has knowingly committed an act or practice that violates this chapter." *R.C. 1345.09(F)*. The supreme court recently resolved a split among the districts regarding the meaning of "knowingly," holding that "the supplier need only intentionally do the act that violates the Consumer Sales Practices Act. The supplier does not have to know that his conduct violates the law for the court to grant attorney fees." *Einhorn v. Ford Motor Co. (1990), 48 Ohio St.3d 27, 30*. Accord *Tanner v. Tom Harrigan Chrysler Plymouth, Inc. (1991), 82 Ohio App.3d 764*. On remand, the fact-finder should consider whether there is sufficient evidence that Tru-Built acted knowingly to justify an award of reasonable attorney fees.

Second, Tru-Built remarks in its brief that Layne was not entitled to a jury trial on his claim of a violation of the Consumer Sales Practices Act since that claim is statutory. Tru-Built did not raise this issue in the trial court and has therefore waived the issue on appeal. Even if Layne was not entitled to a trial by jury, the trial court could [*17] have properly permitted a jury to consider the consumer complaint in the absence of any objection to its doing so.

Third, Tru-Built contends that because Layne's attorney negotiated on Layne's behalf, any deceptive or unconscionable acts were practiced upon Layne's attorney, not Layne himself. Since Layne's attorney does not come within the definition of a consumer under the Act, Tru-Built argues, no violation of the Act could have occurred. While Layne's attorney communicated with Tru-Built, the record indicates that Layne himself continued to deal with McGowen and other representatives of Tru-Built until the contract was terminated and a suit was filed. Therefore, this argument is without merit.

Although we agree with Layne that the trial court erred in directing a verdict on the consumer complaint, we disagree that it would be appropriate at this juncture, as part of the relief granted by this court, to either treble the contract damages awarded by the jury or award attorney fees. In addition to there being no evidence presently of record as to attorney fees, more fundamentally, as both treble damages and attorney fees are dependent upon the factfinder's assessment of all of the [*18] evidence bearing on the consumer complaint, any such awards would be premature if made at this time.

The assignment of error is sustained.

The judgment of the trial court granting Tru-Built's motion for a directed verdict will be reversed and the case will be remanded for further proceedings in accordance with this opinion.

. . . . . . . . . .

BROGAN, P.J. and FAIN, J., concur.